## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JAMES MCMILLION, Individually and on Behalf of a Class of Persons Similarly Situated, | : : : | **Case No.   05-CV-2762** |
| Plaintiff, | : : | |
| -against- | : : | |
| S.A. JOHNSON, KATHLEEN LIGOCKI, ANTHONY FERNANDES, JURGEN GEISSINGER, ALI JENAB, JOE LOUGHREY, JAMES R. LOZELLE, GEORGIA R. NELSON, ENRIQUE ZAMBRANO, CHRISTOPHER T. HATTO, DUGALD K. CAMPBELL, SCOTT D. RUED, and JOHN DOES 1-30 | : : : : : : : | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITIES ACT** |
| Defendants. | : : | |

Plaintiff, James McMillion, on behalf of himself and all other persons similarly situated (the "Participants"), and on behalf of the Tower Automotive Retirement Plan, Tower Automotive Union 401(K) Plan, Tower Automotive Products Savings Investment Plan, and Tower Automotive Products Employee 401(K) Savings Plan (collectively referred to as the "Plans"), by their attorneys, alleges the following:

### NATURE OF ACTION

1.      This is a civil enforcement action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1132.

2.      The lawsuit concerns the Plans.  The Plans are employee benefit plans established by Tower Automotive, Inc.  ("Tower Automotive" or the "Company") to provide its employees tax-advantaged savings for retirement and other long-term goals. The Plans are defined contribution plan covering a significant amount of Tower Automotive's employees.

3.      Plaintiff James McMillion sues S.A. Johnson, Kathleen Ligocki, Anthony Fernandes, Jurgen Geissinger, Ali Jenab, Joe Loughrey, James R. Lozelle, Georgia R. Nelson, Enrique Zambrano, Christopher T. Hatto, Dugald K. Campbell, Jurgen M. Geissinger, and Scott D. Rued, who are the administrators and directors of the Plans and/or the directors and/or officers of the Company.  Plaintiff also sues John Does 1-30, individual members of the retirement committee(s) of the Plans whose identities are currently not known.

4.      Plaintiff James McMillion is a current employee of Tower Automotive and a participant in the Tower Automotive Retirement Plan.  Plaintiff alleges that defendants, Tower Automotive  and certain individuals, are fiduciaries of the Plans, and breached their fiduciary duties to them and the other participants and beneficiaries of the Plans, in violation of ERISA § 409, 29 U.S.C. §1109, in connection with the Plans' holdings of Tower Automotive common stock.  Plaintiff alleges that defendants are obliged under ERISA to make the Plans whole for the losses suffered as a result of defendants' failure to discharge their fiduciary obligations.

5.      Because plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes a participant to sue for plan-wide relief for breaches of fiduciary duty, the brings this action on behalf of themselves and all the participants and beneficiaries of the Plans during the relevant period.

6.      Tower Automotive is a designer and producer of structural components and assemblies used by automotive original equipment manufacturers.  The Company was developed out of a roll-up of many small companies.  During the 1990s, Tower Automotive rapidly grew itself by aggressively acquiring smaller parts manufacturers, a strategy for development known as a roll-up.  Throughout this process, Tower Automotive became mired in significant debt, having acquired too

2

many companies and paying too much, and had failed to adequately integrate the acquisitions.  By the beginning of the Class Period, Tower Automotive was mired in debt and struggling with maintaining one of the most leveraged balance sheets in the industry.

7.     By no later than the beginning of the Class Period, Tower Automotive and the Individual Defendants knew or should have known that Tower Automotive's stock was a highly inappropriate investment for a long-term retirement savings plan such as the Plan because of the Company's financial condition and failing operational performance.  Despite this knowledge, defendants continued to offer Tower Automotive's stock as a Plan investment alternative and failed to impute, or disclose,  their full knowledge of the Company's operations to Plan Participants so that the Plan Participants could make informed decisions concerning their Plan investments in Company stock.

8.     Defendants knew that due to its poor financial condition, Tower Automotive was extremely vulnerable to a variety of intrinsic and extrinsic economic factors, events and industry trends.  During the Class Period, numerous events brought increasing financial pressure on the Company, further eroding the Company's poor liquidity.  These factors included extended pricing pressure on the Company from its customers, a dramatic increase in the price of steel, a substantial input for the Company, and eroding volume in demand for its products caused by a lagging economy.  Although defendants knew or should have known that Tower Automotive was an inappropriate investment by the beginning of the Class Period, the confluence of macroeconomic events that arose during the Class Period were known by defendants to result in significant deterioration in the Company's ability to operate as an ongoing business operation.  Defendants breached their fiduciary

duties to the Plan, resulting in defendants continuing to permit the Plans to acquire and retain shares of Tower Automotive common stock.

9.      Ultimately, the Company filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code on February 2, 2005, in the Southern District of New York, wiping out the value of the Plans' holdings of Tower Automotive common stock.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a).

11.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and ERISA §502(e)(l), 29 U.S.C. §1132(e)(l), and personal jurisdiction over defendants pursuant to Fed. R. Civ. P. 4(k).

12.      Venue is proper in this district pursuant to ERISA §502(e)(2), 29 U.S.C. § 1132(e)(2), because Tower Automotive conducts business, or may be found, in this District.  Moreover, related securities and other ERISA class actions are pending in this District.  In addition, Tower has sought protection under the bankruptcy laws of the United States in this District.

## PARTIES

**Plaintiff**

13.      Plaintiff James McMillion is a current employee of Tower Automotive and a participant of the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  Through numerous employee contributions and employer contributions, plaintiff acquired securities of Tower Automotive during the Class Period.

4

**Defendants**

14.     Tower Automotive is a Delaware corporation with its principal place of business located at 27175 Haggerty Road, Novi, Michigan 48377.  Tower Automotive Inc. is a designer and producer of structural components and assemblies used in automotive industries.   The Company is not a named defendant because it filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code on February 2, 2005, in the Southern District of New York.

15.     Defendant S. A. (Tony) Johnson ("Johnson") served as Chairman and as a Director since April 1993.  Ryan was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.  Johnson also acted as a fiduciary through his participation in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

16.     Defendant Kathleen Ligocki ("Ligocki") served as President, Chief Executive Officer since August 2003 and as a Director since September 2003.  Ligocki was a fiduciary of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.  Ligocki also acted as a fiduciary through his participation in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

17.     Defendant Anthony Fernandes ("Fernandes") served as a Director since May 2003.  Fernandes was a fiduciary of the Plans within the meaning of ERISA in that he exercised

discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.  Fernandes also acted as a fiduciary through his participation in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

18.    Defendant Juergen M. Geissinger ("Geissinger") served as a Director since May 2000.  Geissinger was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets. Geissinger also acted as a fiduciary through his participation in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

19.    Defendant Ali Jenab ("Jenab") served as a Director since January 2001.  Jenab was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.  Jenab also acted as a fiduciary through his participation in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

20.    Defendant Joe Loughrey ("Loughrey") served as a Director since November 1994. Loughrey was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.  Loughrey also acted as a fiduciary through his

participation in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

21.      Defendant James R. Lozelle ("Lozelle") served as a Director since May 1994. Lozelle was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.  Lozelle also acted as a fiduciary through his participation in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

22.      Defendant Georgia R. Nelson served as a Director since May 2001.  Nelson was a fiduciary of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.  Nelson also acted as a fiduciary through his participation in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

23.      Defendant Enrique Zambrano ("Zambrano") served as a Director since December 1997.  Zambrano was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.  Zambrano also acted as a fiduciary through his participation in communications to Plan Participants, including, for example, by execution of the

Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

24.     Defendant Christopher T. Hatto ("Hatto") was at all relevant times the Company's Chief Accounting Officer ("CAO").  Hatto was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.  Hatto also acted as a fiduciary through his participation in communications to Plan Participants, including, for example, by execution of the Plans' Form 11-Ks.

25.     Defendant Dugald K. Campbell ("Campbell") served as the President, Chief Executive Officer and Director from December 1993 until his retirement in August 2003.  Campbell was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.  Campbell also acted as a fiduciary through his participation in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

26.     Defendant Scott D. Rued ("Rued") served as a Director at all relevant times until his retirement from that position in May 2003.  Rued was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.  Rued also acted as a fiduciary through his participation in communications to Plan Participants, including, for

example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

27.     John Does 1-30 were the individual members of the Plans' administration committee(s) (the "Plan Committee"), whose identities are currently not known.  The Plan Committee consisted of employees of the Company appointed by the Board of Directors of Tower Automotive and acted as the Plans' administrator.  According to the Form 11-Ks filed with the Securities and Exchange Commission ("SEC") on June 28, 2004, the Plan Committee interprets and communicates the provisions of the Plans, ensures that all government and participant reporting requirements are fulfilled, and approves certain distributions from the Plans to participants.  Plaintiff will seek leave to join such defendants when their identities are ascertained.

28.     The defendants referred to in paragraphs 12-24 are collectively referred to herein as the "Individual Defendants."

## APPROPRIATENESS OF CLASS ACTION

29.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and on behalf of a class (the "Class") of all persons similarly situated. The Class itself consists of all persons who were participants in or beneficiaries of the Plans at any time from August 3, 2001 through the present (the "Class Period"). Excluded from the Class are defendants, directors of the Company, at time relevant hereto, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

25.     The prerequisites of subdivision (a) of Rule 23 are met as follows:

a.      Rule 23(a)(1).  The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, there were thousands of current and former employees who were participants in or beneficiaries of the Plans.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Plans participants and beneficiaries may be identified from records maintained by Tower Automotive or the Plans' trustee and may be notified of the pendency of this action by mail.

b.      Rule 23(a)(2).  Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein and defendants' breach of fiduciary duty.

c.      Rule 23(a)(3).  Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in ERISA class actions as well as other class actions and securities litigation.

d.      Rule 23(a)(4).  There are questions of law and fact common to the Class, including, but not limited to, the following:

(1)      Did defendants breach their fiduciary duties owed to Plan participants and beneficiaries?

(2)      Did defendants' communications to participants provide complete and accurate information concerning the risks of investing in Tower Automotive stock?

10

(3)     Did defendants provide false and misleading information, or fail to disclose material information, concerning the financial health of the Company?

(4)     What steps, if any, did defendants take to investigate and monitor whether it was appropriate to continue to offer Company stock as a retirement vehicle for Plan participants?

(5)     Did defendants take adequate steps to protect the Plans and recover Plans' damages?

26.     The prerequisites of subdivision (b) of Rule 23 are met as follows:

a.     Rule 23(b)(1)(B).  As an ERISA breach of fiduciary duty action for plan-wide relief, this is a classic Rule 23(b)(1)(B) class action in that the prosecution of separate actions by the members of the Class would create a risk that adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

b.     Rule 23(b)(1)(A).  Alternatively, the prosecution of separate actions by members of the Class would create a risk of inconsistent or varying adjudications with respect to the individual members of the Class which would establish incompatible standards of conduct for defendants.

c.     Rule 23(b)(2).  Alternatively, defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

d.     Rule 23(b)(3).  Alternatively, questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them and there will be no difficulty in the management of this action as a class action.

30.     There are one or more putative class action securities cases pending against the defendants. The claims herein are under ERISA and related principles of federal common law and are not being asserted by the plaintiffs in those other class actions. The named plaintiffs in those class actions do not adequately represent the plaintiff or the Class herein with respect to ERISA claims and may be subject to defenses and limitations of liability under the PSLRA and other statutes and Rules that do not apply to the claims asserted herein.

31.     Under and required by ERISA, defendants carry insurance for claims asserted herein that may not be available to the defendants in the securities class actions.

32.     The Class contains persons who made purchases within the time frame implicated in the securities class actions, as well as persons who made no purchases within the Class Period for the securities actions, and persons who purchased both within and outside the securities class action time frame.

33.     There are people in this Class who are not members of the classes or putative classes in the securities class action cases.

## THE PLANS

34.     Upon information and belief, the Plans are each an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. §1002(2)(A).  Further, the Plans are "eligible individual account plan[s]" within the meaning of ERISA §407(d)(3), 29 U.S.C. § 1107(d)(3), and

also are "qualified cash or deferred arrangement" within the meaning of I.R.C. §401 (k), 26 U.S.C. §401(k). The Plans are not parties to this action. Pursuant to ERISA, however, the relief requested in this action is for the benefit of the Plans.

35.     Tower Automotive was formed to acquire R.J. Tower, now a wholly-owned subsidiary of the Company. R.J. Tower is the sponsor and administrator of the Plans.

36.     Subject to Internal Revenue Service limitations, participants of the Plans were permitted to contribute before and after tax payroll deductions to the Plans. According to the 2003 Form 11-K filed with the SEC on June 28, 2004, participants could elect to make contributions to the Plans through payroll deductions of 1 percent to 90 percent of their compensation.

37.     Participants directed the investment of their contributions to various investment options available in the Plans. Most of these options were diversified mutual funds. However, the options also included the Tower Automotive Company Stock Fund which invested solely in the common stock of Tower Automotive.

38.     The Company made discretionary matching contributions to each participant based on the participant's contribution. This matching contribution amount was determined annually. According to the Form 11-K filed with the SEC, in 2003 the Company elected to make matching contributions of 100 percent of the first 3 percent of each employee's eligible wages deferred, plus 50 percent of the next 2 percent of each employee's eligible wages deferred.

39.     The Plans also provided that the Company could make annual discretionary profit-sharing contributions as determined by the Board of Directors on an annual basis.

40.     Participants' contributions to the Plans and employer-matching contributions were always fully vested. Participants became fully vested in the Company's discretionary profit-sharing contributions after the completion of three years of service.

## DEFENDANTS' FIDUCIARY STATUS

41.     During the Class Period, the defendants had discretionary authority respecting management of the Plans and/or the management or disposition of the Plans' assets and had discretionary authority or responsibility for the administration of the Plans.

42.     During the Class Period, all of the defendants acted as fiduciaries of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) and the law interpreting that section.

43.     ERISA requires every plan to provide for one or more named fiduciaries, who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(l), 29 U.S.C. § 1102(a)(l). Instead of delegating fiduciary responsibility for the Plans to external service providers, the Company chose to comply with the requirement of section 402(a)(l) by internalizing the fiduciary function. It did so in various ways.

44.     First, during the Class Period, the Company designated a Plan Committee comprised of employees of the Company appointed by the Board of Directors of Tower Automotive to act as the administrators of the Plans.  According to the Form 11-Ks filed with the SEC on June 28, 2004, the Plan Committee interprets and communicates the provisions of the Plans, ensures that all government and participant reporting requirements are fulfilled, and approves certain distributions from the Plans to participants.  The Plan Committee members, each named fiduciaries of the Plans, were each appointed by the Board of Directors and operated with oversight of the Board of Directors.

14

45.     Second, ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under Section 402(a)(l), but also any other persons who act in fact as fiduciaries, i.e., perform fiduciary functions. ERISA § 3(21)(A)(i) (29 U.S.C. § 1002(2l)(A)(i)) makes a person a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets." During the Class Period, the defendants performed fiduciary functions under this standard and acted as fiduciaries under ERISA by, among other things, appointing  Plan administrators and making statements to participants with respect to the Company, its financial results and business prospects.

46.     Further, Tower Automotive and the Individual Defendants performed fiduciary functions by communicating with Plan Participants with respect to the Plans, including, without limitation, through Tower Automotive's Form S-8 Registration Statements, the Plan Prospectus, and Tower Automotives's periodic SEC reports incorporated by reference into the Form S-8 Registration Statements and the Plan Prospectus.

47.     In addition under ERISA, in various circumstances non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable. To the extent any of the defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the fiduciary breaches described below.

## FACTUAL BACKGROUND TO BREACHES OF FIDUCIARY DUTY

48.     Tower Automotive is a designer and producer of structural components and assemblies used by automotive original equipment manufacturers.  Its products include automotive body structural stampings and assemblies, including exposed sheet metal components, lower vehicle

structural stampings and assemblies, suspension components, modules and systems. The Company has over 60 manufacturing, product development and administrative facilities located throughout the world.

49.     The Company was developed out of a roll-up of many small companies.  During the 1990s, Tower Automotive rapidly grew itself by aggressively acquiring smaller parts manufacturers, a strategy for development known as a roll-up.  Throughout this process, Tower Automotive had acquired too many companies, paid too much for them, and failed to adequately integrate the acquisitions.  By the beginning of the Class Period, Tower Automotive was mired in debt and struggling with maintaining one of the most leveraged balance sheets in the industry.

50.     On August 3, 2001, the beginning of the Class Period, *Moody's Investors Service* ("Moody's"), a leading provider of credit ratings, research, and analysis for debt instruments and other securities, downgraded the credit ratings of Tower Automotive and its subsidiaries.  The report provides a plethora of concerns that had affected the Company prior to the beginning of the Class Period, continued to affect the Company in 2002, and would ultimately lead to the Company's demise.  These causes of concern were known, or should have been known, by the defendants and should have alerted the defendants, as fiduciaries, to the high risk nature of the Tower Automotive stock as a Plan investment alternative.  Yet, they were largely ignored, despite the fact that the negative events had occurred, were ongoing and would continue throughout the Class Period until the bankruptcy of the Company.

51.     The *Moody's* report set forth the following rationale for the downgrade:

Moody's downgrade of Tower's ratings and our negative outlook were triggered by the company's significantly weakened last-twelve-month operating performance; marked deterioration of credit protection measures; and currently limited ability to

utilize more than about $300 million of its $825 million bank revolving credit facility due to financial covenant constraints. These developments are attributable to the convergence of a series of unfavorable market and product mix factors, along with approximately $35 million of cash restructuring costs and an unusually large investment need associated with Tower's record number of major new program launches. Tower's sales volume has been hurt, similarly to the sales volumes of its peers, by the cyclical downturn in North American OEM automotive production volumes. The negative margin impact has been further exacerbated by the company's high fixed overhead level. Tower's customer base is additionally characterized by high concentrations with domestic OEM's Ford and DaimlerChrysler, which together accounted for over 65% of Tower's fiscal 2000 revenues (excluding joint ventures). Since the third quarter of 2000, both Ford and DaimlerChrysler have experienced greater-than-average production cuts as a consequence of dealer inventory management; the Firestone tire recalls which acutely affected Ford Explorer and Ranger production; and the continued loss of North American market share. Tower has additionally experienced a recent shift in its product mix to include increased business with lower-than-historical margins as a consequence of several factors. These include the end of the life cycle of certain older platforms; the addition of less profitable revenue bases of certain strategic foreign acquisitions during 2000 and early 2001; Tower's currently limited control over module sourcing; and the dramatic downturn of the heavy duty market and the subsequent sale by Tower of its heavy-duty business to the company's Metalsa Mexican joint venture (which enjoys a much lower average wage rate). Tower is furthermore in the process of gearing up for four major near-term program launches, which undertaking entails very material up-front cash investments in the form of capital expenditures; launch expenses; tooling; and design that must be spent well in advance of the revenue stream that will ultimately be generated. Moody's continues to be concerned with Tower's strong reliance on the successful execution and public reception of these key new programs, all of which potentially face stiff competition from an increased level of product offerings by foreign OEM's and OEM transplants. Tower may be particularly exposed with regard to the success of the new Ford Explorer, given the platform's delayed launch earlier this year and the possibly irreversible long-term damage to the Ford Explorer's reputation which may have resulted from recent negative publicity regarding the vehicle. While Tower has more recently been focusing on expanding its ability to service OEM's globally and to achieve geographic diversification through acquisitions and joint venture investments, 85% of the company's 2000 revenues were still generated in the US and Canada.

*     *     *

Future events that would have potential negative implications for Tower's rat ings include material unforeseen difficulties encountered with Tower's 2001 launches; the possible failure of the key new platforms on which Tower has material content to

achieve anticipated sales volumes; the inability of Tower to further diversify its customer base (unlikely in light of a growing relationship with Nissan, as well as with certain other foreign OEM's); or a prolonged automotive industry downturn during which Tower cannot adequately manage its operating leverage or working assets. Future events that would have potential positive rating implications include evidence of success with program launches in progress; diversification across a larger number of platforms; and greater financial flexibility, including improved revolving credit access or capital markets transactions.

*       *       *

For the 12 months ended June 30, 2001, Tower achieved revenues of approximately $2.44 billion, down almost 4% year-over year. Significant declines for Ford, DaimlerChrysler and heavy duty revenues were partially offset by lower-margin revenues from foreign acquisitions. Tower's LTM Adjusted EBITDA Margin (before restructuring expenses) declined year-over-year from about 16%, to about 12%, due to factors identified above. Tower's leverage, as measured by "Total Debt Incl. Preferred Stock/Adjusted EBITDA", rose markedly from under 2.5x a year ago to about 4.1x including only on-balance sheet debt, and to about 4.7x after additionally including about $60 million of off balance sheet debt and the $104 million net present value of a new operating lease for assembly equipment. Tower's LTM June 30, 2001 adjusted EBITA interest and dividend coverage fell from over 5.5x, to only about 2.0x. Tower's LTM June 30, 2001 adjusted EBITA return on assets fell by almost 50% over the course of the past year to approximately 6%, but would be expected to improve rapidly as the 2001 new program launches each take effect.

52.     On August 7, 2001, Tower Automotive made a presentation at the J.P. Morgan/Harbour auto conference.  Then Chief Financial Officer Anthony Barone told analysts that the third quarter of 2001 would be its most difficult to date.

53.     On August 16, 2001, Ford Motor Company ("Ford") announced that it would cut production by 8% in its next quarter, amidst a sluggish economy.  Citing Tower Automotives dependence on business from Ford, accounting for approximately 35 percent of Tower Automotive's revenues, securities analyst at Credit Suisse First Boston, Wendy Needham, downgraded its rating on Tower Automotive's common stock.

54.     On September 20, 2001, Tower Automotive announced that it was canceling one of four shifts on its Ford Ranger frame manufacturing line, resulting in the termination of 50 employment positions at its plant in Milwaukee, Wisconsin, as a result of Ford's reduction in the production schedule for its Ford Ranger.

55.     On September 28, 2001, the Company lowered its sales and earnings guidance for the third and fourth quarters of 2001, citing likely slow sales of automobiles expectations and resulting production cuts by automakers, including Ford.  The Company also stated that it would be able to meet debt obligations through the end of the year, an announcement indicative of concerns over the struggling Company's financial position and liquidity

56.     On October 18, 2001, the Company reported that for its third quarter 2001 it had lost $1.4 million, compared with year earlier operating profit of $10 million.  Tower Automotive also announced plans to close a stamping and assembly plant in Sebewaing, Michigan, resulting in the elimination of 500 jobs.  Kenneth Blaschke, securities analyst for Deutsche Banc Alex. Brown, noted that Tower Automotive's sales would have declined 13 percent if Asian sales had been included in the consolidated results instead of counted as equity income.  Defendant Campbell stated that earnings were of secondary importance to the liquidity and management of the Company's cash flow.  In the Company's press release, defendant Campbell commented on the quarter's financial results as follows:

> This year has continued to prove to be the most difficult year in Tower Automotive's history. Our third quarter results were impacted by unplanned volume declines in our U.S. and Canada region and continued new product launch costs during the quarter. Third quarter performance has further contributed to weak performance year-to-date when compared to the 2000 period.

57.    On December 28, 2001, the Company announced a reorganization and restructuring plan. In connection with the plan, the Company announced that it would be incurring charges of $289 million in its fourth quarter 2001. The charges along with the restructuring plan reflected the growing challenges faced by the auto parts industry as auto sales stagnated and auto manufacturers faced an extremely competitive market where competition through pricing incentives became a predominant strategy for success. As a result of these market conditions, auto manufacture began placing extensive pressure on auto suppliers, such as Tower Automotive, to lower prices and limit production. These macroeconomic issues merely exposed the extreme vulnerability that Tower Automotive was already positioned by the beginning of the Class Period as a result of its formation. As discussed in an article titled "High Yield Auto Parts Suppliers Facing Tough First Half, published on January 8, 2002 by Dow Jones & Company, Inc. ("Dow Jones"), the auto parts industry, as a whole, was facing a challenging short term outlook due to expectations of poor auto sales which resulted in auto manufacturers directing auto parts manufacturers to keep production low. The article noted that prices of bonds of automobile manufacturing related companies were at , or near, "distressed" levels. Other reports from market analysts also indicated dim outlooks for the sector and provided concern for companies with extensive leverage and high interest expenses.

58.    On January 25, 2002, the Company announced fourth quarter and annual results ended December 31, 2001. The Company reported adjusted net income for the fourth quarter of $3 million on revenues of $639 million, down from adjusted net income of $15 million on revenues of $629 million for the same period a year earlier. However, including impairment and restructuring charges, the Company reported a net loss of $296 million for the fourth quarter, compared to a net loss of $70 million for the same period a year earlier including impairment charges. For the year, the

Company reported a net loss of $268 million including the effect of restructuring and impairment charges, compared to a net income of $13 million for 2000.  The charges for the quarter totaled $384 million - $203 million to write down goodwill and an underperforming asset and $181 million to close a plant in Michigan.

59.     Reflective of the ever looming threat and concern over its debt, liquidity and expenses during the Class Period, the Company commented that it "achieved significant reduction in debt through. . . financing activities."  During 2001, the Company reduced its debt to $601 million, down $320 million, or approximately 30%.  Commenting on initiatives instituted during 2001 to address the difficult sector environment, defendant Campbell stated, "[w]e also made difficult decisions to reduce our manufacturing capacity and administrative footprint, to more closely align the cost structure of Tower Automotive to the current economic outlook for automotive production."  The Company stated that it expected continued weakness in production volumes for the first part of 2002.

60.     On January 31, 2002, the Company announced that it was discontinuing certain operations of its Milwaukee Press Operations facility resulting in the termination of approximately 400 employees.  In connection with this action, the Company announced that it would record cash closing charges of $15 million and non-cash charges of $60 million related to asset impairment.

61.     On February 1, 2002, J.P. Morgan raised its investment rating for the Company's common stock.  In April 2002, J.P. Morgan was selected to serve as an underwriter in the issuance of Tower Automotive common stock that would result in net proceeds of $222.5 million to Tower Automotive in June 2002.  Despite the increase in rating and target price for the stock in its February

2002 report, J.P. Morgan's analyst, David Bradley, stated in the report that "[w]e believe the risks facing Tower – both economic and company specific – remain considerable."

62.     On March 16, 2002, corporate credit ratings agency Standard & Poor's ("S&P") lowered the credit rating of Tower Automotive to "BB."  In its report, S&P stated that the credit rating reduction reflected "deterioration in Tower's financial flexibility following a challenging year" marked by declines in automotive production and delays in product launches.  As reflected by the Company's actions to address its extensive leverage and debt, defendants knew that deterioration in the Company's credit rating would result in greater financial strains on the Company and could potentially be fatal to the Company's existence.

63.     In acknowledgment that its leverage and debt remained a risk to the Company, the Company announced on April 3, 2002, that it was issuing 15 million shares, along with an over-allotment option of 2.25 million shares, to the public in order to raise capital.  According to the Form S-3 filed with the Securities and Exchange Commission ("SEC") on April 3, 2002, the Company "will use the net proceeds from the offering to repay borrowings under our senior credit facility." The offering would commence in June 2002, resulting in net proceeds to the Company of $222.5 million.

64.     Despite its purported efforts to strengthen its liquidity by reducing debt, the Company was also utilizing other means to allow it to sustain its business amidst a difficult climate. An article published by the *Wall Street Journal* on May 8, 2002, entitled "Cash Flow? It Isn't Always What It Seems" discussed accounting techniques that can be used to create the appearance that a company's cash flow is better than its operations really reflect.  It also discussed interpretations of a

22

Company's accounts payable figure.  The article commented on Tower Automotives accounting as

follows:

> Companies also can adjust operating cash flow upward by taking longer to pay their
> vendors, thereby increasing their accounts payable, Mr. Mulford notes. . . .

*      *      *

> An increase in accounts payable also helped Tower Automotive Inc. in a difficult
> 2001; the company lost $268 million from continuing operations last year, after
> making $16 million the previous year.  But operating cash flow looked far better in
> 2001, up to $514 million from $93 million in 2000, helped by a rise in accounts
> payable to $369 million from $248 million the year before.

> Like American [Airlines], "Tower was taking longer to pay in a difficult year," says
> Mr. Mulford. . . . But in its most recent annual report, the company said it was
> seeking longer terms from vendors to improve its management of working capital.

65.      On June 24, 2002, *Moody's* improved Tower Automotive's credit rating outlook to

stable from negative, citing, among other reasons, the recent capital injection provided by the stock

offering.  The *Moody's* report stated, in relevant part:

> Tower's ratings remain constrained by the fact that the company continues to face
> several critical risk factors which are expected to hamper performance going forward.
> Tower was very challenged during 2001 on both operational and financial fronts by
> its three major program launches. Tower risks future launch difficulties in the event
> that the company does not identify how to avoid similar problems in the future, or if
> it once again commits to a large number of programs that must be launched
> simultaneously. The company's ongoing liquidity would benefit significantly in the
> event that up-front capital investment in new programs can be reduced either through
> winning the early stage engineering and design aspects of future programs or through
> a reduction in the level of future plant automation. Tower remains highly dependent
> upon the success of Ford and DaimlerChrysler, which represented 35% and 25%,
> respectively, of the company's revenues in 2001. Tower additionally has substantial
> exposure to a selected set of vehicle programs and therefore does not benefit from the
> security afforded by a high degree of contract diversification. As evidenced by
> Tower's 2002 weaker-than-expected performance, the company's business is highly
> cyclical due to the dependency upon consumer spending of automotive sales and
> production levels. Volume declines at Tower translate into even larger fall-offs in
> margins given the company's innately high degree of operating leverage. This

23

remains the case even after incorporating the impact of the company's comprehensive restructuring and lean manufacturing cost-cutting efforts over the past couple of years. Tower continues to have a substantial amount of goodwill, which is the by-product of 14 acquisitions to date. Preliminary estimates for the cumulative transitional impairment charge that will need to be recorded effective as of January 1, 2002 range from $100 million to $200 million.

66.      Moreover, the report provided ample concerns that the fiduciaries knew or should have known were material to the determination of adequacy of the Company's common stock as an investment.  These concerns, listed as "future concerns" under the report, were present throughout the Class Period and would greatly increase in their effects as the Class Period continued.  The *Moody's* report provided as follows:

Future events that would have potential negative implications for Tower's ratings include materially lower-than-expected production volumes for the company's critical platforms; steady loss of market share by Tower's key customers; loss as an incumbent supplier of future replacement programs; cancellation or delay by OEM's of future programs; unforeseen operational difficulties encountered with the execution of future program launches; an inability of Tower to further diversify its customer base (unlikely in light of a growing relationship with Nissan, as well as with certain other foreign OEM's); the inability to reign in future capital investment; poor ongoing controls over working capital; or a significant new debt-financed acquisition.

67.      On July 19, 2002, the common stock of Tower Automotive dropped 15% on concerns that the Company was suffering significant production problems for certain production lines.  A report issued by Charles Brady, a securities analyst for Credit Lyonnais, cited problems with production platforms for Ford Explorer and Lincoln Aviator sport utility vehicles and DaimlerChrysler AG's Dodge Ram pickup.  The report stated that "TWR is experiencing difficulties in North America with operational inefficiencies, launch problems and program delays."  The previous day, defendant Campbell stated, during the conference call held in connection with its earnings release, that U.S. based customers were providing significant pricing pressures.  Moreover,

he indicated that the Company was "prepare[d] for the worst" in southern Europe and that Brazil had been a constant struggle as it was experiencing significant pricing pressures along with increases in steel costs in that region.  Brazil was not the first time the Company experienced problems associated with steel prices and it would not be the last.  In fact, costs associated with steel prices would significantly impact the Company in broader markets, including North America, later in the Class Period.  Defendants knew or should have known that these underlying costs can have a significant impact on the Company's ability to maintain cash flow and the liquidity required to support the Company as an ongoing enterprise.

68.     On September 16, 2002, the shares of Tower Automotive declined 8.6% after a Ford executive said that Ford was working with Tower Automotive to further reduce costs.  The importance of Ford as a customer to Tower Automotive would continue to play a significant role in the performance of the Company throughout the Class Period, as it had in the past.  In fact, Ford was Tower Automotive's single largest customer, comprising approximately 35% of the Company's revenues.  In an article published by *Reuters News* on September 16, 2002, securities analyst for Lyonnais Securities, Charles Brady, was attributed with stating "People may have interpreted the comments made by Ford management as indicating that Tower was susceptible to pricing pressure and the cost savings realized by Ford may have been derived from Tower's profit margin."  The article further attributed a trade association with stating that automotive component suppliers, such as Tower Automotive, were under intense pressure from automakers to cut costs.

69.     On October 18, 2002, the Company announced earnings for the third quarter and nine months ended September 30, 2002.  Including the after-tax effect of one-time items, the Company reported a net loss of $115 million for the nine month period.  Results were impacted by higher than

expected interest charges.  The Company ended the quarter with long-term debt of $511 million and total debt of $837 million.  This was a sequential increase from the prior period which the Company had ended with long-term debt of $434 million.  Despite prior efforts at reducing its leverage by paying down debt, the Company was still extensively leveraged.  The Company's leverage calculation ratio (total debt divided by earnings before interest, taxes, depreciation, and amortization) was 3.0 at the end of the third quarter of 2002 versus 3.6 at the end of 2000.  It's leverage percentage (total debt net of cash  as a percentage of the total capital of the company) at the end of October 18, 2002, was 51% compared to 57% at the end of 2000, when its debt levels hit their peak.  During the conference call held the same day in connection with the earnings announcement, the Company's Chief Financial Officer stated that the Company's intention was to have the leverage percentage at 35-40% within three years.  The Company never achieved this.  As the Company's leverage percentage would head in the opposite direction than intended later in the Class Period, the fiduciary defendants failed to adequately monitor the appropriateness of Tower Automotive's common stock and continued to permit the Class to maintain and acquire shares in the Company's stock despite the significant risks that the Company had been facing throughout the Class Period and the failure of the Company to address the extensive risks which would certainly result in its seeking bankruptcy protection.

70.    During the October 18, 2002 conference call held in connection with the earnings announcement, the Company announced that it was reducing its prior estimates for the fourth quarter as a result of across the board reduction in demand it was experiencing among customers as well as "the more realistic forecast of interest expenses."  Debt levels were a key concern during the October 18, 2002 conference call.  The following discourse between Barone and Darren Kimball, securities

analyst for Lehman Brothers, reiterates concerns among analysts regarding Tower Automotive's high

debt levels and debt level management:

> Darren Kimball: just -- I have a question on cash flow. You guys keep talking about free cash flow as the 72 million that's in that slide -- 10 million on the quarter, 72 million year-to-date. And I look at your cash flow statement, and your cash from operations is 12 million -- I'm sorry, 19 million -- and if I take our the 108 for cap ex, your operating cash flow -- at least the way I define it -- is negative 89 million, which I think is probably the explanation to Steve's question about why the debt's going up. So, I'm trying to understand why you're calling EBITDA minus cap ex free cash flow.

> Anthony Barone: But, we're not calling it free cash flow. The s[l]ide [ ] says we're generating cash flow, and I think to Ron Tadross's previous question, the concern was that we're investing more going forward in this business than we're generating operationally.

> The point we're trying to make is that there is separation between our cash earnings and our capital investment. You then have -- to get to free cash flow, have to take the other things off of the equation -- debt service being one. We have in debt service only the requirement from payment of interest that we're estimating to be about $64 million a year. And beyond that, it's the fluctuation relative to working capital changes, up or down, that for the quarter -- in any one quarter would be cyclically driven, whether we're good or bad. But, as we see it going forward on an annual basis, we see opportunities for improvement in working capital over an extended 12-month period.

> \*      \*      \*

> Darren Kimball: Can you also just review your debt maturities going out over the next couple of years, and how much room you have on the covenant compliance situation?

> Anthony Barone: Well, again, debt maturities -- we have probably the next due date for any refunding is on the subordinated ventures (ph) which is August of 2004. And then, I think we've got a term loan payment due in 2005, which is about 125 million on the term loan, so probably 50 million of the 125 would be due in '05, and then 75 in '06. Those are the scheduled maturities that we have. And the revolver facility itself -- originally, it was six year facilities. I guess it comes due in June of '06.

> On our most restrictive covenant, we have availability of about $225 million as of the end of (inaudible).

71.     On November 14, 2002, J.P. Morgan securities analyst David Bradley issued a report highlighting the ongoing concerns over auto sales as a result of weak economic conditions and continued high-incentives that manufacturers were using in order to get consumers to purchase automobiles.  In his research report, Bradley urged investors to avoid investing in companies with high operating and financial leverage, including Tower Automotive.  Throughout the Class Period, such incentives would dominate automobile manufacturers' competitive strategies for inducing consumers to purchase automobiles.  These incentives to consumers ultimately resulted in extensive pricing pressures on automobile parts manufacturers, including Tower Automotive, from the automobile manufacturers.

72.     On December 17, 2002, Tower Automotive announced that it would not continue as a supplier for the frames for the next generation Ford Explorer.  In the Company's press release announcing this decision, defendant Campbell stated that the decision was "based strictly on the fact that the expected returns at targeted pricing levels did not meet our requirements."  This decision merely emphasized the ongoing problems that the Company had been experiencing with its Ford Explorer frame manufacturing plant.  In essence, the Company had admitted that it was unable to profitably manufacture frames for the Ford Explorer.  The implications as to the state of the Company's operations was significant considering the lengthy relationship between Ford and Tower Automotive and that Ford comprised approximately 35% of Tower Automotive's revenues.

73.    On December 30, 2002, a column entitled "Tower May Be Just the Beginning" was published in *Automotive News* casting a negative light on the economic outlook for the automobile parts supplier industry.  The article stated:

> This month, Tower Automotive Inc. did what some might consider suicide. It said it would not bid again on the Ford Explorer frame.
>
> Tower and a company it bought in 1997, A.O. Smith, have been making frames for the Explorer as long as there has been an Explorer.
>
> Everyone knows that you don't say no to an automaker - ever. And yet this may be just the start of a movement that will put even greater pressure on automakers and their suppliers.
>
> Someone out there, perhaps offshore, probably will be willing to build frames for Ford at the price Ford demands. But I can't help remembering that perhaps that was one of the problems with the Ford Explorer and the Firestone tire.
>
> Some tire makers chose not to supply Ford with tires for the Explorer because the suppliers felt they could not build a safe tire for the price Ford was willing to pay.
>
> There's something wrong when you discover that some suppliers won't even bid on a product for an upcoming automobile. If it's a safety-related item, it gets tricky.
>
> As suppliers are squeezed tighter and tighter, there will be a lot more that, like Tower, say no.
>
> It has been a long time since a major supplier was willing to stand up and say that the price is too low.
>
> On the other hand, with the fierce competition in the marketplace and the difficulty that any domestic vehicle maker is having raising retail prices, it could well be that the makers are caught between a rock and a hard place.
>
> Suppliers have reached their bottom. There is little or no blood left in those turnips.
>
> Manufacturers can't raise prices and they have to spend huge amounts of money in incentives to keep their market shares and volume.
>
> It's going to get worse before it gets better.

29

There are so many pressures on suppliers that many of them are not going to be able to supply parts.

The business is in a bit of a mess these days, and it will take a strong economic recovery to get us on the right track again.

74.     On February 14, 2003, the Company reported its fourth quarter and annual results of the period ended December 31, 2002.  The Company sustained a net loss for fiscal 2002 of $97.6 million.  The Company had made net repayments of debt of $159 million for the year, resulting in a 53% leverage ratio.  Commenting on the Company's continued efforts to strengthen its balance sheet and reduce debt, defendant Campbell stated that "we are not completely satisfied with our progress to date on some of these objectives.  We will continue to focus on reducing our capital intensity and generating additional cash."

75.     On March 17, 2003, Tower Automotive shares fell sharply after Ford announced that it had cut its second quarter production by 17%, amidst sluggish demand.

76.     On March 27, 2003, *Moody's* lowered Tower Automotive's liquidity rating to SGL-3, from SGL-2.  *Moody's* also lowered its credit rating outlook to negative, from stable.  The accompanying report cited "material deterioration of the company's near-term liquidyt profile driven by several factors."  Among the factors noted included the Company's drawing down of ra revolving credit facility to finance a stock buyback program, the violation by the Company of its leverage covenant in the event that vehicle production volumes decline, and significant demands for cash to support new program launches.  The report stated the following with regard to the potential impact from a decline in light vehicle production:

Moody's lowered Tower's rating outlook to negative, from stable, due to concerns regarding the potentially negative impact that a decline of North American light vehicle production volumes below 16 million units could have on Tower's near-term

cash flow generation capabilities and access to liquidity. Given the company's high proportion of fixed operating expenses, combined with its very substantial requirements to invest in growth, a meaningful decline in unit volumes would likely cause Tower to realize negative 2003 free cash flow and could additionally lead to the company's violation of the leverage covenant per the senior credit agreement. Under such a scenario, the company's access to cash could fall short of the level necessary to operate the existing book of business while also covering the research, tooling, launch expenses, and capital expenditures necessary to support new business awards. Moody's therefore expects that Tower will have to step up its degree of reliance upon external sources of financing over the next year. However, Tower's existing bank covenant limitations restrict effective availability under Tower's $600 million revolving credit. Tower's access to other alternative financing solutions could also be limited, given the company's extremely low current stock price and market capitalization, as well as the presently unpredictable high yield bond market.

*      *      *

Future events that could drive Tower's ratings lower include escalating liquidity concerns which would most likely be generated by a material decline in production volumes, evidence that Tower's mix of larger programs is unfavorable, higher-than-expected investment levels for new programs, and/or problematic launches. Indications that Tower is experiencing declining market shares or is in pursuit of substantial near-term acquisitions could also drive ratings lower. Tower's rating outlook would likely stabilize in the event that North American production volumes can be maintained at 16 million units or better, the company achieves some debt reduction through divestiture of certain non-core assets, Tower demonstrates an ability to tightly control capital spending and launch costs in the event that production volumes do actually decline meaningfully, and/or a bank amendment is executed to loosen future financial covenants.

77.     On April 22, 2003, the Company issued a press release announcing financial results for the first quarter of 2003. Commenting on the performance of the Company, defendant Campbell stated:

> While sales were up compared to last year, softening in certain platform volumes tended to offset strong Dodge Ram, Ford Expedition and Cadillac CTS sales. Our focus for 2003 is to ensure the new Volvo, Nissan and GM launches are flawless, and at the same time implement swift countermeasures to mitigate the impact of any further reduction in customer production releases.

31

78.     During the conference call held in connection with the earnings report, defendant

Campbell expanded upon the continued manufacturing problems related to the Ford Explorer frame:

> And where we're at is that the frame production for the Explorer is still not at planned levels of cost. Although certainly, compared to last year, performing much better. I reported to you in February that we have the constraint issue resolved, and we can routinely produce 39 jobs an hour down the final assembly line which is the design capacity for that line. The plan for this year was to use our new manual offline operations to basically supplement the automatic front and rear build stations, while we worked on improving their throughput.
>
> So this was sort of an intermediate, help out these slower performing upstream operations. But the fact of the matter is we have not been able to get those automatic stations to work any faster and, therefore, we need to run the manual stations more than we planned, which is more costly than we planned. Especially when the volumes are strong, which they were in February. I went down a [inaudible] couple of weeks ago to have a look at the progress and to see what else could be done or was being done and concluded, unfortunately, that while there are still things we can do to decrease cost, wrier in the incremental range rather than something dramatic going forward.

79.     In addition, defendant Campbell acknowledged that liquidity was a key concern of the

market.  During the conference call, defendant Campbell commented on liquidity concerns:

> The next area is liquidity. That seems to be on everybody's mind and they're worried about it. But don't. We had $117 million availability at the end of the first quarter and we will be in compliance throughout the year. The most restrictive covenant crank, down to 3 1/2, or cranks down to 3 1/2 , at the end of Q2 and we have plans, and place to ensure that we will have at least the same level of liquidity as we had in Q1 throughout the rest of the year. We're also looking at -- I was look at ways to improve the cushion. We're looking at underperforming resources really in every category as well as working with our customers to get more front consideration, for example, on things like capital investments that are really project-specific in nature, much like tooling, and being handled in the same way as tooling.
>
> So, in addition, we're looking at our overall debt structure to make sure it's optimized for both the short and the long term. So that's something that is ongoing as well.

80.    During the conference call, Ernie Thomas, CFO, discussed the Company's debt and liquidity position.   These figures indicated that the Company continued to struggle, for the worse, with its liquidity position.   He summarized the positions as follows:

> In terms of liquidity, total capacity of $600 million is unchanged since the fourth quarter of '02. **We did increase our drawdown of the revolver by $65.8 million up to $243.1 million.** Unused capacity $356.9 million. For a total liquidity of $375.7 million. That's down against $436 million in the fourth quarter of '02. Our strictest covenants we mad $116 million available as of the end of the first quarter of '03. We expect, again, to maintain at least that amount going forward throughout the year. Just a word about the takedown in availability from 239 at the end of Q4 of '02, **part of that change was due to a tightening of the covenant requirement, roughly $63 million, and part was due to a change in the increase in debt, roughly $65 million.** So those two together account for the $123 million change availability, fourth quarter '02 versus first quarter of '03.
>
> Page 10. Shows our total capitalization. **The big issue here is we had an increase in our total debt due to the lack of free cash flow in the first quarter, basically. Debt to capital stood at 54% as of the end of first quarter of '03 versus 53% as of the end of '02, and 60% as of the end of first quarter of '02.** [Emphasis added]

81.    Despite defendants awareness that the extensive leverage of the Company, heavy debt-load, and liquidity concerns made investments in the Company stock an extremely risky proposition, defendants engaged in a campaign to minimize such issues and concerns and continued to permit the Plans, and members of the Class, to retain and acquire the common stock of Tower Automotive.

82.    During the conference call, the Company held a question and answer session.   The following exchange took place between Stephen J. Girsky, a securities analyst for Morgan Stanley, and defendant Campbell which highlights the overarching lack of control and certainty within management regarding the administration and governing of the Company's operations:

Stephen J. Girsky: Uh-huh. And let me ask you, did we change anything at the Explorer plant? I mean, where's the accountability here? Is there anything that could suggest to the outside world that things are being held accountable.

Dugald Campbell: Yes, you will hear about changes being announced later today in terms of leadership changes to demonstrate and to respond to the accountability. It doesn't change the fact that there are still -- there is still a major fundamental issue with that line that, without further investment, with two years left to run, doesn't make a lot of sense. We will approve [sic, should be "improve"] the situation, and we will approve [sic, should be "improve"] it with leadership that's absolutely focused and adhering to the cost-down expectations. So two things are happening: Leadership will be improved, and more attention to the detail in the cost. The dramatic changes in the line will not be forthcoming.

Stephen J. Girsky: We've got to suffer with two years of a loser out here or how does it resolve itself?

Dugald Campbell; It's not a loser. It's not performing to the expectations that the line was designed for.

Stephen J. Girsky: Your guidance suggests that the second half of the year, there's not going to be much money made at this company. Using your math, it's somewhere between 4 cents and 15 cents a share for the entire second half of the year. So what is it? I can read down this list. Is majority volume, you're basically suggesting volume is going to be basically a disaster in the second half of the year?

Ernie Thomas: It's really a combination of lower volume and heavy spending on launch costs in the latter half of the year. Back to the Explorer, it's actually better than it was a year ago. It's not up to our expectations, but it's better than a year ago. The through put is better. It's not up to expectation, but it's improved over a year ago.

Stephen J. Girsky: Why is pricing and economics, which seemed to be favorable in Q1, Q2, why does it become unfavorable in the second half of the year?

Dugald Campbell: We've got some negotiation underway and we expect to get back price in the latter half of the year. That's what that is. And the first part of the year, we had some one-time adjustments for some material changes that affected that favorably in the first part of the year that won't occur in the second part of the year.

83.    The exchange between the same analyst and defendant Campbell reflected the seriousness of the concerns over the Company's continued viability due to its significant debt load and its lack of cash flow necessary to sustain its operations:

> Stephen J. Girsky: So we should assume the same. So do you think you've got enough -- you said yourself the cash flow's negative here, right? And we've got $200 million coming due next year. I mean, how much do we have to pay off? What's our needs -- our liquidity needs next year besides operation?

> Dugald Campbell: Well, we should start to see some free cash flow in the second half of '04. So I'd think in the second half of '04 as the volume and earnings pick up, we should start to see some free cash flow. Now we do have the convertible coming due in August. We have room in the revolver to take the convertible out next year. And to be honest, we are also looking at some long-term possibilities for capital structure in terms of debt. So we expect to be able to take our convertible and also have sufficient liquidity throughout '03 and '04 to meet our needs.

> Stephen J. Girsky: Uh-huh. All right. Thank you.

84.    Further discussions during the conference call between David Leiker, securities analyst for Robert W. Baird, and defendant Campell, and between securities analyst Nadav Braun of CRT Capital and Dave Tuitt, Investor Relations and Treasurer for Tower Automotive, highlight the extent of the Company's leverage position and the extreme risks associated with the Company even considering its relatively positive outlook.  The following discourse evidences how far out on a ledge the Company would persist:

> David Leiker: Okay. And then, Ernie Thomas, I think you made the comment you expect to be generating free cash flow the second half of '04.

> Ernie Thomas: Yes.

> David Leiker: I interpret that to mean that your debt isn't going to decline at all over basically the next 12, 15 months. Is that fair?

> Ernie Thomas: That's fair.

35

David Leiker: And with a step up in your -- or step down in your coverage ratio show, the EBITDA to 3 1/2, your availability in your credit facility right now is $116 million. How do you get that to $200 million next year?

Ernie Thomas: The credit agreement allows us some flexibility, and we plan to take as a result full advantage of that and also just prudent management of working capital. The capital expenditures, timing of those, we expect to take actions. Also, some of the savings we haven't talked about yet will help us to maintain liquidity.

*     *     *

Nadav Braun:  I know there's been focus on capital restructuring and I'm shore to return to this point. You've mentioned a couple of near-term fixes that you're looking at. But given the level of spending that you have on launch costs in the latter half of the year, it's very difficult for me to see how you're able to maintain compliance over the sort of next year, year and a half.

Obviously, you need to be in compliance in order to use your revolver to pay down the convert notes. I'm wondering, you know, what types of discussions you've had with you your banks, and what types of discussions you've had with other sort of financing, high-yield or any other types of mezzanine financing here. If you could speak to that, it just looks as if you're going to have a fairly significant liquidity problem later in the year or early in '04.

Dave Tuitt: Well, we don't expect to have a liquidity problem, but we are up front with our banks, and our banks know our situation. And we've explained everything to them. And if we had to do an amendment, we could get an amendment, that would not be a problem. We have talked with several different sources regarding the long-term issue of having an appropriate capital structure that matches long-term financing needs with long-term availability of financing. And those are ongoing. And, you know, we're going to move relatively quickly in decide ago long-term strategy, which will address both the short-term issue you mentioned, as well as the long-term financing issue.

85.    Lastly, during the conference call defendant Campbell acknowledged the liquidity

concerns of the Company:

Let me say we have a short-term issue with maintaining liquidity, there's also the long-term structure of the balance sheet and we have a lot of reliance on short-term financing. We need to address that issue relatively quickly. So we're looking at alternatives to get a long-term focused debt structure in our balance sheet. And we're looking at alternatives at the present time to do that.

36

86.     On May 28, 2003, the Company announced that it intended to offer an aggregate of approximately $250 million of senior notes due 2013.  The Company stated that it would use the net proceeds from the offering to repay amounts of outstanding debt under its senior credit facility and for general corporate purposes.  This transaction was completed on June 6, 2003.

87.     On June 18, 2003, the Company announced that it had completed an amendment to its senior credit facility in an effort to enhance the Company's overall liquidity and provide flexibility to redeem its $200 million convertible subordinated debentures early.

88.     On July 22, 2003, the Company announced financial results of the second quarter and six months ended June 30, 2003.  The Company reported a net loss of $124 million for the six month period.  The Company further highlighted its efforts to reign in its burdensome debt, which only led to a further incomplete picture of the Company's ongoing problems not only with its debt, but also its operations.

89.     On August 13, 2003, the Company issued a press release that then CFO Ernie Thomas had resigned, effective the same day.  Thomas had joined the Company in that capacity in November 2002.

90.     On August 19, 2003, the Company announced that it had to record an additional $258.8 million in debt that it had previously kept off its balance sheet.

91.     On October 15, 2003, the Company announced that it was revising its outlook for the third quarter ended September 30, 2003.  The Company lowered its expectations for revenues for the quarter from the range of $640 million to $650 million to approximately $620 million.  The Company further forecasted a loss for the quarter of $1.78 per share versus the previous guidance of

a loss between $0.16 and $0.24 per share.  The Company blamed labor disruptions at Hyundai and

Kia facilities in South Korea and charges related to the transferring of production of Ford Ranger

frames from its Milwaukee plant to an Ohio factory.  An article published on October 16, 2003, in

the Detroit Free Press, entitled "Tower Says 3rd Quarter Loss Bigger; Soon-To-End Contract With

Ford Hurts Supplier" focused on the troubles to Tower Automotive as a result of its heavy reliance

on Ford as a customer:

> The company is giving up the Explorer business because it says Ford isn't paying
> enough for the parts. The business, which is expected to end by mid-decade, is one of
> Tower's biggest contracts. The Explorer accounts for a big chunk of Tower's annual
> revenue. The company lost $97.6 million in 2002, on revenue of $2.75 billion.
>
> Marc Santucci, a supplier industry analyst at auto consulting firm ELM International,
> said Ford is the root of many of Tower's woes.
>
> "The biggest problem is they are a big Ford supplier and Ford hasn't done that well,"
> Santucci said. "As Ford goes, Tower goes."
>
> The automakers also routinely demand that suppliers cut their prices, and that also
> hurts the bottom line, experts say.
>
> Ford made up 38 percent of Tower's sales last year.
>
> Other charges against earnings include $4.4 million, or 5 cents a share, related to the
> previously announced retirement of chief executive Dugald Campbell and $3.3
> million, or 4 cents a share, for an equipment failure that disrupted production at its
> Plymouth factory.

92.     On October 21, 2003, Tower Automotive announced a series of organizational

changes in its North American operations, including consolidating its North American product

groups, changes to its leadership team and moving its enterprise headquarters.  Commenting on this

reorganization effort, just one of many in the Company's difficult history, defendant Ligocki stated,

without any revealed basis considering the Company's financial position and the economic environment, "[i]n the next few years, we will enjoy tremendous revenue growth in all our regions."

93.     On October 23, 2003, the Company announced its financial results for the third quarter and nine months ended September 30, 2003.  The Company reported a net loss of $101 million for the quarter and $92 million for the nine months ended September 30, 2003.  Discussing these results, defendant Ligocki stated:

> Tower Automotive faced several challenges during the third quarter, including the impact of lower sales volumes related to labor disruptions at Hyundai and Kia facilities in South Korea. We also recorded significant asset impairment charges to align the company's balance sheet with our current business plan.  We are in the midst of several major program launches, which underlie our revenue growth over the next few years, and our top priority for our customers and shareholders is to deliver on the promise that growth represents.

94.     The same day, the Company held a conference call in connection with its earnings announcement.  Therein, it announced that it anticipated capital expenditures for 2003 of about $240 million, rather than the $200 million previously estimated.  During the question and answer session, Dave Tuitt stated the following in response to a question concerning the  cash flow of the Company and the impact of the additional debt that had been off balance-sheet occurred:

> Cash burned in the quarter, and I guess I (inaudible) the word burn but is negative. For the quarter, if you look at slide 20, our cash flow from operations was $27 million in the quarter. Cap ex was $81 million, so it's a negative pre-cash flow of $54 million which is pretty much exactly what our net change in cash and debt was during the quarter. It's a little hard to reconcile debt change to our cash flow right now because we have both our revolver and our cash going up and down. At the end of the quarter, we happened to not have anything proud on our revolver. We had about $25 million last quarter. We have to take the net of those two amounts. In regards to off balance-sheet items, I'm glad you asked me. This way, nobody will have to call me all day asking this. The AR securitization was about $15.9 million at the end of the third-quarter, the net present value of the operating lease we have which would be secured off balance-sheet financing is $291 million and the EBITDA

add back, i.e., the additional hit to EBITDA about having the (ph) operating lease instead of finance in normal operations is $60 million on a LTM basis.

95.    On December 23, 2003, *Moody's* lowered Tower Automotive's liquidity rating to SGL-4 from SGL-3, stating that Tower Automotives near-term liquidity position had deteriorated to "weak" from "adequate."  The report issued by *Moody's* in connection with the downgrade provided the following basis for the downgrade:

> The lowering of Tower's speculative grade liquidity rating to SGL-4 reflects Moody's current expectation that Tower's liquidity (defined as "cash plus effective unused availability") will likely fall materially below $100 million during the first three quarters of 2004, due to negative free cash flow generation during the period. The company will continue to be challenged through the latter part of 2004 by its commitments for contemporaneous execution of a series of significant new program launches. These include launches for the Nissan Titan/Armada (frame), Cadillac SRX/STS (powertrain module), Volvo S50/V50 (body structures), Ford Freestyle/Five Hundred (body structures), Nissan Pathfinder/Xterra (frame), BMW 1&3 Series (body structures), and DaimlerChrysler New Dakota (frame). Tower's operations were additionally disrupted during the latter part of 2003 by announcements of major changes to its senior management team, which included changes in the company's chief executive officer and chief financial officer. However, the selection of Kathleen Ligocki as CEO and the other management changes are aimed at developing best practices to better focus and integrate Tower's operations, establish shared services, even out performance, and create more flexible manufacturing systems.
>
> Inefficiencies to this point have caused the associated launch costs to meaningfully exceed original estimates. The company notably has been managing through a compressed launch schedule for the Nissan Pathfinder/Xterra. In addition, Tower recently increased its capital spending estimates for 2003 to $240 million, from $200 million, which represents a substantial use of additional cash. Most of the increase in capital spending is associated with engineering and content changes related to the Ford Freestyle, along with assumption of another supplier's work related to this program. A portion of the additional expenditures will eventually be recouped through the piece price. Tower's reimbursable tooling balance as of September 30, 2003 had grown to almost $200 million, but about $172 million of that balance was owed to the company's own suppliers.
>
> The third quarter of 2003 also proved to be a tough operational quarter for Tower. The company endured a labor strike in Korea, an equipment failure at the Plymouth,

40

Michigan facility, and disruption and additional costs associated with executive retirement and recruitment. An incremental $124.5 million of restructuring and impairment charges were recorded during the third quarter, but the bulk of these charges were non-cash in nature. Throughout 2003, Tower experienced the negative impact of lower production levels and a less favorable revenue mix.

Tower is in the process of finalizing the legal work necessary to pledge additional inventory and receivables collateral to support the senior secured credit agreement. It is fully expected that the revolving credit facility will be secured at that point and that the commitment will be increased by $200 million, to $316 million, in order for Tower to refinance its $200 million of convertible subordinated notes. The substantial portion of all of the company's tangible domestic assets will be encumbered at that point.

Tower will remain reliant during 2003 upon its external financing commitments to offset the significant cash outflows that will continue to be necessary to support the company's launch of its book of business. Moody's notes that the company requires a base level of cash of $10-15 million in order to operate. In addition, a total of about $110 million of open letters of credit reduce unused bank availability. Due to customer concentration issues, the company can consistently only use $30-$35 million of its $60 million maximum accounts receivable securitization facility. The bank financial covenants tighten significantly after the conclusion of 2004.

96.     On January 19, 2004, the *Crain's Detroit Business* published an article entitled

"Ligocki: Tower May Sell Units; New CEO Cites Cash-Flow Problems, Debt Load" that stated, in

part:

> Tower Automotive Inc. CEO Kathleen Ligocki said the company may sell some businesses as it tries to boost cash flow during a critical year for the company.
>
> Novi-based Tower has capital-spending commitments this year as it launches new products for Ford Motor Co. and Nissan Motor Co. But the company also carries a heavy debt load from acquisitions. Tower's long-term debt was $996.6 million as of Sept. 30. The company manufactures automotive body structures and chassis systems and reported revenue of $2.1 billion through the first nine months of last year.
>
> New business and operational improvements might not be enough to reach cash-flow targets this year, Ligocki said last week during an interview at the Automotive News World Congress in Dearborn.
>
> ``For the last quarter of (2003) and the first quarter of (2004), we'll have negative

cash flow as we invest for new projects,'' she said. ``Then we turn that work into cash flow. That may not be enough. We may need to look at incremental financing measures ... such as divesting some businesses.''

*     *     *

Fitzgerald said smooth launches on the Ford and Nissan projects are important for Tower because it needs to show it can generate cash flow and profits on new business. Poor launches hurt suppliers, especially capital-intensive ones like Tower, because the extra cost wipes out any profit margin. Tower reported $240 million in capital expenditures in 2003.

The company reported an operating loss of $74.4 million through the first nine months of last year, which included $147.6 million in restructuring and asset impairment charges.

``Because their margins are thin and the balance sheet is not strong, their ability to buffer a problem is less than it was three to four years ago,'' he said. ``The cost to manage a bad launch can literally exceed the first-year sales value. There's no way to recover that, and it can turn a thin-margin program into a negative one.''

97.     On February 12, 2004, Tower Automotive announced fourth quarter and full-year 2003 results.  For the fourth quarter, the Company reported a net loss of $25 million, in part due to a $27.4 million write-down of a joint venture and $6.9 million in restructuring and impairment charges.  Earnings Before Interest, Taxes, Depreciation, and Amortization  ("EBITDA") for the quarter had declined 14.1% versus the same period a year prior.  The Company's EBITDA for the year had decreased 56% versus the prior year.  This was a six year low.  Commenting on the Company's financial priorities, defendant Ligocki stated that the "top priorities for 2004 continue to be keeping our launches on-track while focusing on cash flow and continuing to make fundamental improvements in operations."  These results would later be revised.  On March 8, 2004, the Company filed its Annual Report with the SEC on Form 10-K.  The restated results indicated the Company lost $33 million for the fourth quarter.  The restatement was the result of a determination

that a one time $9.1 million pretax gain from its Mexican joint venture, Metalsa, should be recognized on a quarterly basis, instead of all at once.

98.    In connection with the earnings announcement, the Company held a conference call on February 12, 2004.  Contrary to statements made earlier in the Class Period that the Company would not be impacted by steel price fluctuations,[1] the Company acknowledged that it was experiencing unexpected costs associated with steel prices.  During the conference call, defendant Ligocki stated, in part:

> We are beginning on steel to see some surcharges like many of our companies [sic]. Demand increases in Asia primarily in China are creating surprise shortages worldwide. . . . We our protected on a significant portion of our buy, about 60% of the steel is bought through re-sale programs with our OEM customers and we do already have agreed upon long-term contracts covering the majority of our European buy but significant price increases or surcharges or shortages would be a risk to our plan.

99.    Defedant Ligocki also commented on the liquidity of the Company, ostensibly setting forth a map for the Company's 2004 performance, that, after decryption, sets forth the tight rope on which the Company's viability rested, requiring more than near perfect execution by the Company for its survival.  Defendant Ligocki stated, in part:

> As we have stated before, during 2004, we will use cash during the first half of the year, and generate it during the second half of the year. This is due to the launches, which are occurring during the first half.
>
> On Chart 14, you can see that we finished the year with $161 million of cash. The current portion of debt is 300 million, which includes, 200 million of convertible notes which become due in August.
>
> We'll discuss the converts shortly. At the end of the year, with the net present value of leases which do not appear on the balance sheet of $360 million. This is up slightly

---

1 During the conference held on April 22, 2003, in connection with the reporting of its financial results for the first quarter of 2003, defendant Campbell stated that "[m]ost of our steel purchases is in customer steel buy programs so any impact is minimal in raw materials pricing."

due to leasing activity during the fourth quarter.

On Chart 15, you can see that our liquidity position at the end of the year was 170 million, which is a combination of our cash on hand, and our borrowing availability. At the end of the year, we were tightest on our leverage covenant.

However, the covenant relaxes in the next two quarters under our current credit agreement, and those quarters were expected to be the tightest all along. This will be using cash during the first half, will be tighter on liquidity in the next two quarters before it improves, but we're confident that our business plan as well as other actions that we are considering will give us sufficient liquidity cushion during the year, and get us through to the second half where we anticipate improvement in cash flows.

100.    In addition to the extensive risks associated with investments in the Company's common stock caused by the Company's high debt burden, low liquidity and capital intensive business model, defendants were now forced to acknowledge that the risk to the Company was even greater than ever before due to the surging growth in the price of steel.  Defendants were aware that this threat could be particularly devastating to the Company given the low-margin business that it was in.  Yet, despite these indicators all suggesting that investments in the Company's common stock were in inadequate for the Plans and the Class, defendants continued to permit the Plans and Class members to retain and acquire Tower Automotive common stock.

101.    On March 9, 2004, Credit Suisse First Boston's securities analyst, Chris Ceraso, issued a report stating that higher-than-expected launch costs due to surging steel prices could affect the costs of the Company's near term launching of the Ford 500 and Freestyle programs.  The report stated that "the steel situation looks to be getting worse not better, and although Tower's exposure to directly purchased steel is limited (particularly in North America), rising prices could pose a risk." The significance of the potential impact on the Company's operations was understood by defendants throughout the Class Period.  Moreover, it was of greater significance than ever during the 2004 year

44

as the increasing price of steel came at a time of crucial product launches that defendants held out as key to the Company's future plans. The rising costs of steel would play a pertinent role in the Company's demise as it impacted the ability of the Company to launch its new product lines and created additional strain on the Company's already tight balance sheet by increasing the capital expenditures needed to role out the new products and increasing the costs of the products – products whose margins were already thin. By this time, the Company had clearly been an inappropriate investment due to the high risks associated with its financial and operating conditions. But, clearly, rising steel costs, among other factors, had derailed the "plan" for the Company's future. Yet, despite defendants knowledge of the Company's continued deterioration and declining prospects, defendants continued to permit the Plans and Class members to acquire and retain shares of Tower Automotive common stock.

102.    On April 29, 2004, the Company announced its first quarter 2004 financial results. According to a report issued by *StockDiagnostics.com*, cash flow from operations for the twelve months ended March 31, 2004, reached a five year low, representing a 25% decline versus the comparable year twelve months prior. In Tower Automotive's press release, the Company announced further refinancing plans. Commenting on the refinancing plan, defendant Ligocki stated:

> The refinancing, if consummated, will give Tower Automotive a much more workable debt structure and will provide the financial flexibility appropriate for not only the upcoming period of launch activity, but also for the significant free cash flow we expect to generate in the second half of 2004 and beyond.

103.    In connection with the earnings announcement, the Company held a conference call on April 29, 2004. Commenting on the Company's debt levels at the end of the quarter, Jim Mallak ("Mallak"), CFO, stated:

We closed the quarter with debt on our balance sheet of 1 billion 324 billion. In addition, you will remember that we carry a significant level of operating leases, which are not reflected on the balance sheet. At the end of the quarter, the net present value of these leases equaled 344 million, which adjust our debt level on a pro forma basis to 1 billion 668 million. Our liquidity level at the end of the quarter was 101 million. We ended the quarter with 78 million of cash on hand, and 23 million of untapped revolver, which we had, access to if so needed. . . .

104.     Also during the conference call, defendant Ligocki stated that high steel prices resulted in net costs for steel that were $1 million more than the Company had planned.  Defendant Ligocki acknowledged that the impact of high steel prices would be greater in the second and third quarters, but declined to give estimates.  In particular, defendant Ligocki,  Mallak and Chris Ceraso, securities analyst for Credit Suisse First Boston, had the following exchange during the conference call:

CHRIS CERASO: OK. And then last item, you mentioned in the slide deck, which is very helpful, by the way, that you referred to steel as a crisis. But only you have a net hit to the operating line of a million. Does that, you know, is that telling us something that you're nervous that the effect of steel is going to worsen later in the year or what's behind the term steel crisis?

KATHLEEN LIGOCKI: We'll see a bigger impact in the second quarter and third quarter on steel, just because we were working on inventory in the first. The good news is that the futures on scrap steel are coming down, so a lot of us are hopeful that that means there's a end in sight to what we have right now, but we won't know that. I think for a lot of it, it's characterized because of all of the effort that it's taken to manage steel, both from a price standpoint and supply standpoint this quarter and some of that is still going on both with us and our customers. Certainly occupied a few people's time this quarter. We were able, with a lot of work, to mitigate part of the impact, but we're still managing it this quarter as well.

CHRIS CERASO: So if it was a million in the quarter, can you take a stab at what it will be for year?

KATHLEEN LIGOCKI: We talked a little about that.

JIM MALLAK: There's a lot of plusses and minuses that can go into that because of - we tend to think of it as a net number, where scrap prices are going to go and scrap

will drive the actual steel price as well as we are negotiations with some customers, so I think it's just real fluid for the rest of the year on that. Yes.

105.   On May 18, 2004, Tower Automotive completed the pricing of a private offering of $110 million of 5.75% convertible senior debentures.

106.   On June 30, 2004, World Market Research Center ("WMRC"), a leading global provider of business-critical information, published an article entitled "Steel Prices Cause Havoc in US Component Supplier Industry."  The article stated:

> Rising steel prices are cutting into component suppliers' already thin profit margins and will force some small and medium-sized companies into bankruptcy.
>
> WMRC Perspective
>
> Significance
>  Demand for raw materials from China has pushed the price of rolled steel up by 57% to US$617 in June from US$350 in January. Higher steel costs are halving many suppliers' already thin profit margins, encouraging more suppliers to shift production overseas, while others sit it out.
>
> Implications
>  The Big Three automakers have set up steel resale programmes to ensure that suppliers obtain the steel they need. Suppliers have begun researching steel substitutes for some components to reduce their exposure to steel price swings and are pushing for US government intervention to force the steel industry to lower prices.
>
> Outlook
>  Chinese government intervention to slow industrial expansion has caused scrap metal prices to level off and steel suppliers have lowered surcharges. However, steel prices are unlikely to return to their position prior to their rise since the start of this year and will continue to squeeze suppliers' earnings for much of this year.
>
> Steel Prices Dent Suppliers' Thin Profit Margins
>
> Steel costs have soared for component suppliers since the start of 2004, despite contracts between suppliers and steel producers that lock in steel at a fixed price, as surcharges added on by steel producers have driven up prices. Suppliers were already under pressure from automakers to lower prices on components and the higher costs

are further squeezing their profit margins.

Despite ongoing pressure to supply components at lower prices, suppliers have little option but to increase component prices to offset the higher material costs. Component suppliers are also cutting capital spending and reducing other operating costs to offset rising steel costs.

Suppliers such as Hayes Lemmerz Corp., a maker of wheels and transmissions, have warned of the impact of higher steel prices on this year's earnings. It expects that higher steel prices will reduce its earnings by US$10m-US$15m this fiscal year. When Tower Automotive Inc. announced Q1 2004 earnings, it said that steel prices had resulted in US$1m more in costs than expected, and that it expected a greater impact in Q2 and Q3.

For smaller component suppliers the risk of bankruptcy is greater and this could disrupt production at automakers' assembly plants. There is a danger that, as smaller suppliers are forced out of business, the supply chain will break, leaving automakers without the components they need to continue production.

*       *       *

Suppliers and Automakers File Lawsuits Against Steel-Makers

Both component suppliers and automakers have filed lawsuits against steel producers, accusing them of breaking contracts that lock in steel prices by adding on surcharges.

*       *       *

As a way of ensuring that suppliers continue to receive the steel they need to produce components, the Detroit Big Three vehicle manufacturers have set up steel resale programmes, buying steel in bulk and selling it on to suppliers at a fixed price.

Outlook and Implications

The recent rise in the price of steel, fuelled mainly by demand for raw materials from China, could soon start to slow, as the Chinese government has taken measures to slow the pace of China's industrial expansion in the past two months. As a result, steel scrap prices have levelled off and steel suppliers have lowered surcharges. However, steel prices are unlikely to return to the level they were at prior to their rise since the start of this year and will continue to squeeze suppliers' earnings for much of this year.

The pressure is also on for US component suppliers to match prices of components produced in China, where labour is cheaper. The Detroit Big Three automakers have sent a clear message to their component suppliers to match the prices of vehicle components produced in China or they will purchase directly from Chinese component suppliers or from other suppliers willing to match the prices of Chinese-produced components. Further job reductions will occur in the US component-manufacturing industry, as jobs are shifted abroad and the market share of US component suppliers is threatened by the budding Chinese components industry (see United States: 10 June 2004: Detroit 'Big Three' Price Demands Push Component Suppliers Overseas).

107.   On July 27, 2004, the Company announced financial results for the second quarter of its fiscal year 2004.  The Company reported revenues for the quarter of $783 million, well below the mean of analysts' projections, as collected by First Call, of $820.36 million.  The Company also provided disappointing financial guidance, projecting revenues for its third quarter of 2004 of between $725 million and $735 million, and a loss ranging from $0.18 to $0.22 per diluted share. The First Call mean for the third quarter of 2004 was for a loss of $0.02 on revenue of $819.35 million.  For the year, Tower Company revised revenues to be about $3.15 billion, below the $3.29 billion First Call mean, and earnings per share in the range of $0.00 to $0.08, below the $0.21 First Call mean.  Discussing the lowered guidance for the second half of 2004, Mallak stated:

Let me just cover the main elements causing the lower than anticipated results during the second half of the year. Using the mid-point of the revenue range I just gave you, we see sales from 50 million lower than previously anticipated. This is due to the lower yields production levels at 15.9 million units, versus our previous outlook of 16.2 million units. We are also being impacted by lower outflow volumes in Europe. These lower volumes impact EPS by approximately 11 cents. Additionally, Kathleen mentioned the higher launch costs, specifically within Chicago, which will impact our EPS by 4 cents.

While we continue to have a large portion of our steel purchases from the OEM resale programs, costs from spot buys in the U.S. as well as Europe and Asia continue to rise. The impact from these costs will impact EPS by 4 cents going forward. Through the continued focus on cost reduction, programs are being worked on which could predominantly offset this impact.

As I have mentioned previously, the new credit facility will increase our interest costs and impact EPS by 6 cents. However this new financing package has removed the liquidity overhang,, and has pushed out all significant maturities until 2009. Even though certain macroeconomics factors are going against us, we continue to focus this company on operational excellence. We see the volume and launch issues of the second half of the year as temporary and continue to sure up the base for a strong 2005. I will to now turn the call back over to Kathleen for her closing comments.

108.     The Company also announced on July 27, 2004, that it had completed another round of refinancing, a recurring theme in its battle for survival.  During the conference call held on the same day in connection with the earnings announcement, Mallak summarized the refinancing plan as follows:

The new financing package has 4 basic elements. The first is a $50 million revolver, priced at LIBOR, plus 425 basis points. The second is a 375 million term loan B facility that is fully secured at LIBOR plus 425 basis points. We also entered into a $155 million second lien credit facility, to cover our outstanding letters of credit. This facility will be a synthetic facility and will not appear on our balance sheet, unless the letters of credit are drawn upon. Finally, we were able to issue 125 million of new convertible senior debt, which I previously mentioned. These carry a 5 3/4 coupon and are convertible at a 30% premium.

We used these funds to extinguish our old term credit facility, cover our outstanding letters of credit, and redeem our convertible notes, which were due on August 1, 2004. We were also able to generate 82 million of additional cash to help our liquidity position. And while the additional cash did help our liquidity position, the most important point, that all material debt maturities have been moved out until 2009. Again, this will allow this management team to focus 100% on operational issues and delivering the promised results.

109. The Company also disclosed that changes in operating income were impacted by, among other factors, the additional expense of steel of $5 million as a result of the escalated prices of steel. Commenting on the Company's declining ability to offset rising steel prices, defendant Mallak stated:

> And we see -- we see continuing increases coming, especially in Europe and our spot buys in Asia. And we were able to offset that with some of our scrap recovery, which by the way, has been going down now, scrap prices are going down, and so -- our ability to offset the steel is becoming less and less –

110. During the conference call, Mallak stated the following with regard to the near doubling of interest expenses during the quarter:

> Looking at our results below the operating profit line, you will see that interest expense increased from 18 million in the second quarter 2003, to 38 million during the most recent quarter. Four main factors are influencing this change. First, the issuance of -- in June 2003, of the high yield bond which increased interest cost by $6 million. Second, the write-off of debt issue fees and the call premium associated with redeeming the convertible notes due August 1, 2004, cost $6 million. Third, the higher rates of the new credit facility, impacted the quarter by 2 million. And finally, the fact that we reclassified the trust preferred securities in the third quarter of 2003, under new accounting requirements, which increases interest expense by 4 million, but decreases minority interest by an equal amount.
>
> Going forward, we expect the impact from the higher rates with the new credit facility, to increase our interest costs by approximately $3 million per quarter.

111. Clearly, events leading up to the "pivotal" second half of 2004, previously trumpeted as the savings grace of the Company, were not progressing as speculated. Rather, conditions internally and on a macroeconomic level were continuing to worsen for the Company. Yet, despite the obvious problems that had surfaced, thereby casting further doubt on the Company's future and solidifying Tower Automotive as a high risk investment not appropriate for the Plans or Class

51

members, a condition that was present throughout the Class Period, the defendants continued to permit the Plans and the Class to acquire and retain shares in the Company's common stock.

112.    Defendants' actual uncertainty over the direction and momentum of the Company is reinforced by defendant Ligocki's apparent about-face with regard to the timing of events indicating the Company's purported turn-around.  During the July 27, 2004, conference call, defendant Ligocki, amidst what were her usual positive statements alluding to the Company's prospects, stated that "The 2 most challenging quarters were always going to be the second and the third in 2004, and now one of those is behind us."  Yet, this had never the position of the Company.  To the contrary, the rosiest of pictures were painted for the latter half of 2004.  During the conference call held on October 23, 2003, in connection with the financial results for the third quarter 2003, defendant Ligocki commented on the timeline for when the Company anticipated a reduction in capital expenditures and costs associated with the new product launches, stated, "[w]e have to go through the launch phase for the first part of the year and the last part of '04 is when we really anticipate positive cash flows leading into 2005."  During the conference call held on February 12, 2004, in connection with the financial results for the first quarter of 2004, defendant Millak stated "[a]s we have stated before, during 2004, we will use cash during the first half of the year, and generate it during the second half of the year. This is due to the launches, which are occurring during the first half" and "we are going to use cash during the first half so it will get tighter [leverage ratio compliance] before we get through to the improvement we see in the second half."  Millak also reiterated that launch costs would lighten up in the third and fourth quarter of 2004.  Defendant Ligocki also stated:

> And then the launches start coming onboard and most of the production begins June, July and August, the summer with our automaker customers and then it ramps through the rest of the year. I mean that's the single biggest swing in the operating

> free cash flow. And then of course the launch costs fall out from the first half to the
> second half.

This is particularly concerning as the Company's overarching struggle throughout the Class Period

was its substantial debt and inadequate liquidity, each demanding a return to significant positive cash

flow.  Throughout 2003, defendants and Company reiterated that much of the cash outflow would

occur in the first half of 2004, as a result of new product launches, resulting in the latter half of 2004

to be a period of substantial turn around for liquidity and cash flow as the purported investments in

the first half of 2004 would payout.  In fact, this did not happen.  And, defendant Ligocki's about-

face on the timing of the Company's turn-around evinces the true facts – defendants were aware of

the substantial financial difficulties of the Company; defendants were aware of the substantial risks

to shareholders, including Plan participants, of the Company given the severe liquidity crises and

debt burden; and defendants were aware that any purported plan to turn around the Company was

more than just a gamble, it was a near impossibility.  Yet, despite this knowledge, defendants

allowed the Plans and Class Members to acquire and retain shares of the Company.  Moreover, as

events continued to unfold, including the additional refinancing that costs the Company substantial

sums and escalating steel prices, most of which weighed against the successful implementation of the

turnaround "plan," defendants continued to allow the Plan and Class Members to acquire and retain

shares of the Company.  In essence, defendants high-risk "plan" was not going as intended.  Yet,

consistent with their actions throughout the Class Period, they did nothing to protect the Plans or the

Class.

113.    On September 14, 2004, WMRC reported that the Company would incur costs of $2.4

million as a result from a cut in production at one of its plants in Michigan.

114.   On October 5, 2004, the Company revised its expectations for its financial results for the third quarter of 2004, announcing that it would lose twice as much as it projected when it gave its already disappointing financial guidance it provided on July 27, 2004.  The Company blamed continued increases in steel costs, higher launch costs and lower vehicle production volumes.   The press release issued by the Company stated:

> Tower Automotive, Inc. today announced that it expects earnings to be down as a result of lower vehicle production volumes in North America, continued escalation of steel costs and, to a lesser extent, higher launch costs on new business. Tower expects to report a third-quarter 2004 net loss of between $22.5 million and $25 million, or $0.39 to $0.43 per diluted share. This compares to previous guidance for the third-quarter 2004 of a net loss of between $10.4 million and $12.8 million, or $0.18 to $0.22 per diluted share. These net loss and diluted loss per share estimates exclude restructuring charges and certain non-recurring, non-cash charges. Revenues have softened for the quarter to a range of $710 million to $720 million versus previous guidance of between $725 million and $735 million. Liquidity as of September 30, 2004, is expected to be in excess of $115 million.

> "The combination of lower production volumes on our key platforms in North America, along with continued steel cost increases, added further challenges to the third quarter," stated Kathleen Ligocki, president and chief executive officer of Tower Automotive. "Additionally, even though our launch costs on one major launch are running slightly above plan, it is important to point out that we have met all of our timing and quality commitments to our customers."

115.   On October 6, 2004, *Reuters* published an article titled "US Auto Parts Makers Steel Price Hit Likely in '05" that stated:

> High steel prices that have crushed U.S. auto parts suppliers' results for the second half of the year show no signs of abating into 2005, analysts said.

> And rising costs for other metals, resins and raw materials which largely have been pushed aside in the talk about steel prices also may pressure 2005 results, they said.

> "For the auto parts sector as a whole, we continue to believe 2005 consensus earnings expectations are at risk by up to 10 percent to 30 percent because of higher steel costs," J.P. Morgan analyst Himanshu Patel said Wednesday in a note.

*       *       *

The pressure from steel and resin costs appears largely indiscriminate across the sector for 2005, but may hit some large suppliers harder than others, Patel said.

"Steel, plastics, aluminum and lead costs are definitely a negative for probably everyone, though for some it won't show up as much (in results)," Standard & Poor's credit analyst Martin King said, adding that companies have almost no ability to increase prices to offset higher materials costs.

Many parts suppliers will lock in contracts with steel producers for 2005 in the next few weeks or months, and those costs will probably exceed 2004 levels, King said.

*       *       *

While steel has played a factor in compressing results for the largest suppliers, it also has been blamed for putting two parts-casting companies into bankruptcy and pushing other small suppliers close to seeking court protection.

116.   On October 20, 2004, filed the report with the SEC on Form 8-K stating that it was seeking amendments to its credit facility to increase its ability to securitize its accounts receivable. This action came as a need to replace liquidity that had been provided to the Company through its participation in early payment programs, off-balance sheet arrangements with its customers that allowed its customers to make early payments to the Company at a discount.  These arrangements were being cancelled by the Company's customers, including Ford, General Motors and Daimler Chrysler.  An article published the same day by *Dow Jones*, titled "Tower Automotive Seeks Amendment to Credit Facility" stated:

Tower Automotive Inc. (TWR) disclosed on Wednesday that it is seeking to increase the securitization of its accounts receivable.

The company said it is making the move because automakers have decided to cancel off-balance sheet arrangements that aided the liquidity of suppliers such as Tower Automotive. The off-balance sheet arrangements were designed to provide discounts for early payments by automakers, Tower Automotive said in a filing with the Securities and Exchange Commission.

Tower Automotive said that its senior secured credit facility permits the securitization of up to $50 million of accounts receivable, but the company is seeking an amendment to the credit agreement to increase that limit.

In its request for the amendment, Tower Automotive said that automakers developed the off-balance sheet payment plans in 2001 to help suppliers deal with the liquidity impact of an industry downturn and terrorism-related volatility in financial markets.

The balance sheet impact of the arrangements was to reduce Tower Automotives' accounts receivable, Tower Automotive said, with the discount to automakers being treated as an interest expense.

Ford Motor Co. (F) is phasing out the arrangements in two steps, the first in September and the next in December. DaimlerChrysler (DCX) plans to phase out the arrangements in January 2005, Tower Automotive said, and General Motors Corp. (GM) is expected to phase out such arrangements in December 2005.

Tower Automotive said that the approximate liquidity impact, by customer, will be: Ford, $80 million; General Motors, $25 million; and DaimlerChrysler, $35 million.

117.    Also on October 20, 2004, the Company announced financial results for its third quarter of 2004.  The Company once again lowered its estimates for its future financial results, projecting losses for the fourth quarter and the full year wider than analysts' consensus estimates.  It ended the quarter with net debt of $1.3 billion.  Commenting on the difficulties experienced during the quarter, defendant Ligocki stated the following during the conference call held the same day:

This was certainly a challenging time, both for Tower and for the automotive industry. Macroeconomic forces, in the form of lower vehicle volumes, primarily on key platforms in North America, and increased steel costs, both in base prices and surcharges, combined with Tower's specific incremental launch expenses for our Chicago program to pressure earnings sufficiently for us to issue the earnings warning earlier this month.

118.    Defendant Ligocki also commented on the higher costs it was experiencing associated with one of its major product launches:

> On one of the last two major launches, our team in Chicago is meeting all key program milestones, and exceeding quality expectations. But we have continued to incur costs higher than planned, to assure this throughput and quality level during this early launch phase. These costs should decline in the next quarter and reach normal operating levels early next year.

119.    Again advancing a revisionist outlook on what the Company shared with the public, the Plans, and members of the Class, defendant Ligocki stated, "[w]e knew that this year would be tight, even without lower vehicle volumes and steel" and that the third quarter was "always thought to be a tough one."  As set forth in ¶102, the Company's statements concerning 2004 consisted of a rosy outlook for a strong turn-around beginning in the second half of 2004.  If, in fact, defendant Ligocki knew that all of 2004 would be "tight," then it evidences an admission that defendants failed to fulfill their fiduciary obligation to provide complete and accurate information material to the Plan participants and beneficiaries so that Plan participants could make informed investment decisions concerning their Plan investments in Tower Automotive.

120.    During the conference call, the Company reported that its results had been impacted by, among other factors, the high price of steel which resulted in an additional $12 million expense. Given the significant impact that the price of steel was having on the Company's financial performance, defendant Ligocki provided the following breakdown of the impact of steel on the Company:

> The next slides address our current status on steel. We showed the pie chart on the left side in earlier presentations. This breaks out the $1b steel buy for 2004 into 60% resale, composed of 40% in North America and 20% in Asia, and 40% direct buy, composed of 30% in Europe and Brazil, and 10% bought directly here in North

America. The steel increases in 2004 were incurred on the direct buys, primarily in North America.

In 2005, our plan shows our steel buy increasing to about $1.2b, with over 67% on resale, up significantly from this year. 25% would be direct buys with long-term contracts, which we plan to link directly to customer agreements for recovery. 8% would still be in exposed direct buy, mostly here again in North America. And we are working hard to reduce this exposure.

A quick reflection on steel in 2004. Increases in surcharges once thought to be primarily a first half phenomenon continued through the balance of the year. The market saw year over year price increases of 120% on U.S. hot rolled coil, over 50% on European hot rolled, and over 45% on Korean hot rolled coil. The announcement this week of a major London steel company purchasing U.S.-based International Steel Group or ISG will drive further changes into this market.

Our resale programs did provide protection for the significant portion of our buy, although our OEM resale customers certainly felt the brunt of the price increases. Actually, one automaker recently asked for our support in advocating the elimination of trade barriers in the United States, likely to mask U.S. legislation discussion intended to increase market competition.

We have had some success recovering surcharges in Europe, Brazil and Asia. But the United States, as I said earlier, has proven much more difficult, as all parties took tough positions for most of the year. Tower did end up absorbing most of the increases on the U.S. direct buys, only partially offset by scrap price increases, since contracts had been negotiated over a year ago, when the outlook was so different, and no one knew how long the situation would last.

Operations have been further disrupted by shortages in some types of steel. And at a few times, we even had to trade steel between plants to keep running, or buy very expensive steel coils. We're working on several strategies to assure that 2005 is better.

121.    During the conference call, defendant commented on the actual results versus the

initial expectations, as follows:

In analyzing what changed during the quarter from that guidance at the beginning of the quarter, you can see that almost 70% of the change was due to volume reductions during the quarter, specifically in North America, steel cost increases, and continued higher than expected launch costs at Chicago.

As Kathleen mentioned, we also experienced some production cost issues at our Gent facility that were higher than we had anticipated. Additionally, we did take some small non-cash asset write-offs, due to various fiscal asset inventories around the globe.

122.    On November 22, 2004, *Moody's* issued a report indicating that it was placing Tower

Automotive's debt ratings on review for possible downgrade.    The report stated, in relevant part:

Moody's placed Tower's debt ratings on review for possible downgrade due to the company's increasingly constrained liquidity, insufficient cash interest coverage by operating earnings, and rising leverage. Tower's free cash flow generation has been constrained by significant up-front launch costs and capital expenditures associated with new business rollouts, restructuring and consolidation charges, rising raw materials prices, lower North American OEM production levels, and other factors. Moody's review will center upon the likelihood of whether Tower will be successful in resolving its growing liquidity problem, as well as upon management's updated estimates regarding the timing of the company's return to sustainable free cash flow generation and the support provided for these assumptions. This will include updates regarding the performance of Tower's extensive number of recent launches, estimated production levels associated with major platforms, expected new business awards, projections regarding steel and other commodity prices, anticipated savings from restructuring actions as well as increased centralization and standardization, and other factors. Moody's plans to meet with senior management during December 2004.

For the last twelve months ended September 30, 2004, Tower's total debt/EBITDAR leverage (including off-balance sheet obligations as debt) rose to approximately 6.4x. EBIT coverage of cash interest was insufficient at about 0.6x, and the company appears unlikely to realize earlier projections of 1.0x cash interest coverage through year end. During the LTM period free cash flow was negative $142 million and capital expenditures equaled about $227 million, or 1.6x depreciation.

The affirmation of Tower's SGL-4 speculative grade liquidity rating reflects that the company's liquidity remains weak. Tower's consolidated cash balance as of September 30, 2004 approximated $145 million, and the company remained fully drawn under its senior secured credit facilities. Given the volatility of Tower's intraperiod cash flows and the company's $3 billion annual revenue base, this level of cash availability appears to be low. In addition, Tower acknowledges that it has been stretching trade payables by an average of up to 15 days, which has temporarily generated about $80 million of additional cash from operations.

123.    On December 3, 2004, the Company announced that it was deferring payment of the dividend payment on certain convertible preferred securities issued by the Tower Automotive Capital Trust.  The company cited "short-term" liquidity issues arising from the termination of the early payment programs of its customers.

124.    On January 20, 2005, the Company issued a press release titled "Tower Automotive Announces Update on Liquidity" that stated as follows:

> Tower Automotive, Inc. today announced that its ongoing initiatives to improve liquidity were adversely impacted by the length of customer shutdowns over the holiday season. While the holiday shutdowns were planned, the length of these shutdowns were longer than anticipated at certain key customers. Cumulatively, these shutdowns will adversely impact liquidity by approximately $40 million during the first quarter of 2005.

> As previously announced, Tower Automotive has taken a number of initiatives to improve its liquidity position. Specifically, as previously announced on December 3, 2004, Tower Automotive deferred the dividend payment of approximately $4.4 million on the 6-3/4% trust convertible preferred securities issues by the Tower Automotive Capital Trust that would otherwise have been paid on December 31, 2004. Also, as previously announced on January 4, 2005, Tower Automotive obtained a $50 million accounts receivable securitization facility through GE Commercial Finance. That facility yielded net proceeds of approximately $44 million.

> These and other initiatives were taken to address the elimination of early payment programs from the company's customers. For January, those changes in payment terms will adversely impact liquidity by approximately $17 million.

> Despite Tower Automotive's efforts and the continuing cooperation of its loyal customers and dedicated suppliers, the company continues to face significant challenges in meeting its ongoing liquidity requirements. Tower Automotive is continuing to work with its customers and suppliers to address its liquidity issues. In addition, Tower Automotive is continuing to pursue a European factoring facility, the possible sale of certain equipment and other liquidity initiatives.

125.    Following this news, on January 21, 2005, *Standard & Poor's* ("S&P"), a credit ratings agency, cut Tower Automotive's credit rating by three notches, slashing it further into "junk"

rating levels, to a "CCC."  In its report, *S&P* stated that if customer production schedules did not firm in the near term, that it increased the changes of the Company defaulting.  *Moody's* followed suit on January 24, 2005, cutting Tower Automotive's credit ratings deeper into "junk" territory.  In its report, *Moody's* noted the "rising potential for bankruptcy or some other form of distressed balance sheet restructuring to be required."

126.   On February 2, 2005, Tower Automotive announced that it had filed to reorganize under Chapter 11 of the U.S. Bankruptcy Code in order to address liquidity needs and facilitate debt restructuring.  In the Company's press release, defendant Ligocki stated:

> Over the past twelve months, we have been focused on launching our significant new business backlog while taking the actions necessary to improve profitability and restore long-term financial strength to Tower so that we can continue to grow and meet our customers' needs. Like many companies in the automotive sector, Tower has been affected by lower production volumes on key auto maker platforms and increased steel prices. Additionally, the recent termination of early pay programs at certain auto makers has adversely affected our liquidity. These factors, combined with a complex and restrictive capital structure and an unsustainable debt load have made it clear that a financial reorganization was necessary to resolve these issues. By reducing our debt to more manageable levels and simplifying our capital structure, we will be better able to respond to changes in the market place, satisfy the needs of our customers and help ensure our long-term viability.

127.   If the bankruptcy proceedings conclude in a similar fashion as those of most other publicly held companies, the value of the Plans' holdings in Tower Automotive common stock will be zero.  At the beginning of the Class Period, when the defendants knew or should have known that the Company's common stock was not an appropriate investment alternative for the Plans and the Class, the price of Tower Automotive's common stock closed for trading, August 3, 2001, at $14.15 per share.

128.    A succinct summary of the severe financial and operating problems that plagued the

Company throughout the Class Period was set forth in an article published on February 7, 2005, by

*Automotive News*, entitled "Tower's Problems Began Before Ligocki" that stated:

> When Tower Automotive Inc. CEO Kathleen Ligocki said last month that the supplier had obtained a $50 million loan, the response from investors was underwhelming.
>
> That $50 million, says one analyst, was the equivalent of "bringing Band-Aids to the scene of a train wreck. It's just not enough."
>
> Neither were the changes Ligocki brought to Tower since joining the company from Ford Motor Co. 18 months ago. In the end, a Chapter 11 bankruptcy court filing on Wednesday, Feb. 2, offered her a way to unload debt and boost cash flow.
>
> Impossible burden
>
> As the company's problems intensified, its debt load became an impossible burden. The Chapter 11 filing came one day after the company faced a payment on a $10 million loan with a 9.25 percent interest rate.
>
> Ligocki told creditors in a letter that Chapter 11 offered the best opportunity to "implement the changes necessary to remain competitive." Ligocki was not available for comment.
>
> Creditors and investors in the world's largest supplier of vehicle frames could be in for a rough ride. Analyst David Leiker of Robert W. Baird & Co. of Milwaukee says Tower is likely to emerge from bankruptcy court as a public company owned primarily by debt holders.
>
> Many shareholders are unlikely to receive anything, Leiker says. Tower's share price dropped from $1.10 on Jan. 27 to 77 cents after the filing.
>
> The filing by the Novi, Mich., company does not include operations in Europe, Asia, Brazil and Canada.
>
> The damage to Tower was done before Ligocki joined the company.
>
> During the 1990s, Tower bought too many companies, paid too much for them and failed to integrate them. Troubled launches also hurt, says a source familiar with the company.

Ligocki cut waste, sold underperforming plants and worked to reduce Tower's dependence on the Big 3. In 2003, 64 percent of Tower's global sales went to the Big 3, down from 68 percent in 2002.

But Ligocki struggled with one of the most leveraged balance sheets in the industry. Even if Tower used its cash flow exclusively to pay down debt, it would take six years. Long-term debt was 73 percent of capital for 2003.

Multiple problems

Tower won business, but the cost of launching those programs eroded its cash flow margins to just half of the 14.1 percent it enjoyed in 2000, according to analyst Shelly Lombard of Gimme Credit Publications Inc.

Pressures from lower production volume, Big 3 pricing policies and high steel prices added to the problems.

Ligocki kept Tower afloat a month after analysts said the $50 million cash infusion from GE Commercial Credit was not enough to cover cash needs. But for Ligocki, time simply ran out.

129.    An article published February 5, 2005, by *Detroit Free Press* titled "Tower Automotive Has High Hopes Entering Bankruptcy" also noted the extensive risk that the Company was positioned throughout the Class Period, noting "[i]n the case of Tower, the debt built up from all the acquisitions [throughout the 1990s] made it vulnerable to downturns or unforeseen events, such as the price of steel doubling from 2003 to 2004."

130.    By no later than the beginning of the Class Period, Tower Automotive and the Individual Defendants knew, or should have known, that Tower Automotive's common stock was a highly inappropriate investment for a long-term retirement savings plan such as the Plan because of the Company's financial condition, operational performance and macroeconomic events occurring throughout the Class period. Despite this knowledge, defendants continued to offer Tower

Automotive's stock as a Plan investment alternative and failed to impute their full knowledge of the Company's operations on Plan Participants so that the Plan Participants could make an informed decision concerning their Plan investments in Company stock.

### VIII.   CLAIMS FOR RELIEF

131.   ERISA § 404(a)(l)(A) (29 U.S.C. § 1104(a)(l)(A)) imposes on a plan fiduciary a duty of loyalty - that is, a duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of... providing benefits to participants and its beneficiaries." Section 404(a)(l)(B) (29 U.S.C. § 1104(a)(l)(B)) also imposes on a plan fiduciary a duty of prudence - that is, a duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

132.   A plan fiduciary's duties of loyalty and prudence includes a duty to disclose and inform. This duty entails: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. This duty to disclose and inform recognizes the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the participants and beneficiaries, on the other. In a plan with various funds available for investment, this duty to inform and disclose also includes: (1) the duty to impart to plan participants material information of which the fiduciary has or should have knowledge that is sufficient to apprise the average plan participant

64

of the risks associated with investing in any particular fund; and (2) the duty not to make material misrepresentations.

133.    By no later than the commencement of the Class Period, defendants breached their fiduciary duties to disclose and inform with respect to the Plans' use of employer stock as a plan investment. During the Class Period, and before, any investment in employer stock in the Plan was an undiversified investment in a single company's stock. As a result, any such investment carried with it an inherently high degree of risk. These inherent risks made defendants' duty to provide complete and accurate information about investing in company stock even more important than would otherwise be the case. Rather than providing complete and accurate information to the Plans' participants and beneficiaries regarding the risks of investing in company stock in the Plan, defendants did the opposite: they withheld and concealed material information during the Class Period and before, and instead actively misled the participants and beneficiaries of the Plan about the appropriateness of investing in company stock and about defendants' earnings prospects and business condition, thereby encouraging participants and beneficiaries of the Plan to continue to make and to maintain substantial investments in company stock in the Plan.

134.    A fiduciary's duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of all the investment alternatives in the Plan, including employer securities, to ensure that each investment is a suitable option for the Plan. Defendants breached this duty of investigation and monitoring with respect to company stock. By no later than the beginning of the Class Period, defendants could not have reasonably made a determination that company stock was a suitable investment for the Plan, either

for a participant's discretionary account or for the match. In fact, by the beginning of the Class Period, if not before, company stock was plainly an unsuitable investment option for the Plan.

135.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

136.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them when they occur by continuing to allow company stock as a Plan investment during the Class Period, by failing to engage independent fiduciaries who could make independent judgments concerning the Plans' investment in company stock and the information provided to participants and beneficiaries concerning it, and, generally, by failing to take whatever steps were necessary to ensure that the fiduciary of the Plan did not suffer from a conflict of interest.

137.    A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents.  While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary, including a plan sponsor-fiduciary, may not blindly follow the plan document if to do so leads to an imprudent result. ERISA § 404(a)(l)(d) (29 U.S.C.§1104(a)(l)(D)).

138.    To the extent that defendants followed the direction of the Plan documents, for example, in continuing to place the match in company stock during the Class Period, beginning no later than the matches of November 1, 1998, they further breached their fiduciary duties.

## IX.  **CAUSATION**

139.    The Plan suffered a loss, and plaintiff and the other Class members were damaged, because substantial assets in the Plan were invested in company stock during the Class Period in violation of defendants' fiduciary duties.

140.    As fiduciaries, defendants were responsible for the prudence of investments in the Plan during the Class Period unless participants in the Plan themselves exercised effective and informed control over the assets in the Plan in its individual accounts pursuant to ERISA § 404(c) and the regulations promulgated under it.  Those provisions were not complied with here; instead of taking the necessary steps to ensure effective participant control by complete and accurate disclosure and regulatory compliance, defendants did exactly the opposite.  As a consequence, participants in the Plan did not control the Plan assets that were invested in company stock, and defendants remained entirely responsible for ensuring that such investments were and remained prudent. Defendants' liability to the Plan for damages stemming from imprudent Plan investments in company stock is therefore established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period, without regard to whether or not the participants relied upon defendants' statements, acts, or omissions.

141.    The Plan also suffered a loss, and plaintiff and the other Class members were damaged, by defendants' above-described conduct during the Class Period and before, because defendants' materially deceptive statements, acts, and omissions were fundamentally designed to deceive plaintiff and the other Class members about the prudence of making and maintaining investments in company stock. Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant that results in

harm to the participant, the participant is presumed as a mater of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, defendants' above-described statements, acts, and omissions constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in company stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of its plan assets in company stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on defendants' deceptive statements, acts, and omissions.

142.   Plaintiff further contends that the Plan suffered losses, and plaintiff and the other Class members were damaged, by defendants' above-described conduct during the Class Period and before, because that conduct fundamentally deceived plaintiff and the other Class members about the prudence of making and maintaining investments in company stock, and that, in making and maintaining investments in company stock, plaintiff and the other Class members relied to their detriment upon defendants' materially deceptive statements, acts, and omissions.

### X.  REMEDY FOR BREACHES OF FIDUCIARY DUTY

143.   ERISA § 502(a)(2) (29 U.S.C. § 1132(a)(2)) authorizes a plan participant to bring a civil action for appropriate relief under section 409 (29 U.S.C. § 1109). Section 409 requires "any person who is a fiduciary ... who breaches any of the... duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate...."

144.   With respect to the calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the

68

plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the plans' assets to what they would have been if the plan had been properly administered.

145.    Plaintiff and the Class are therefore entitled to relief from defendants in the form of:

(a)    a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as required by ERISA § 409(a), 29 U.S.C. § 1109(a);

(b)    injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2)&(3), 29 .S.C. §§ 1109(a) and 1132(a)(2)&(3);

(c)    reasonable attorney fees and expenses as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law;

(d)    taxable costs; and

(e)    interest on some or all of these amounts as provided by law.

## XI.  REQUEST FOR RELIEF

Based on the foregoing, plaintiff, on his own behalf and on behalf of the other members of the above-described Class, respectfully requests that this Court enter judgment on her behalf and against defendants for a monetary payment to the Plan, injunctive and other appropriate

equitable relief, reasonable attorney fees and expenses, taxable costs, interest, and any other relief the

Court deems just.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: March 10, 2005          **WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

By:  s/Mark C. Rifkin_____
     Mark C. Rifkin, Esq. (MR0904)
     Gregory M. Nespole, Esq. (GN6820)
     Christopher S. Hinton, Esq. (CH0759)
     270 Madison Avenue
     New York, New York  10016
     Telephone: (212) 545-4600
     Facsimile: (212) 545-4653

**LAW OFFICES OF MARC S. HENZEL**
Marc S. Henzel, Esq.
273 Montgomery Ave., Suite 202
Bala Cynwyd, PA   19004
Telephone: (610) 660-8000
Facsimile: (610) 660-8080